[No. H035195. Sixth Dist. Oct. 27, 2011.]

BULLIS CHARTER SCHOOL, Plaintiff and Appellant, v.
LOS ALTOS SCHOOL DISTRICT et al., Defendants and Respondents.

## Counsel

Morrison & Foerster, Arturo J. Gonzalez and Suzanna Pacht Brickman for Plaintiff and Appellant.

Middleton, Young & Minney, Paul C. Minney; Luce Forward and Charles Bird for California Charter Schools Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Dannis Woliver Kelley, John R. Yeh and Donald A. Velez for Defendants and Respondents.

## Opinion

**DUFFY, J.**—The Legislature in 1992 enacted the Charter Schools Act of 1992 (Ed. Code, § 47600 et seq.; the Act).[1] Eight years later, the California electorate amended the Act by adopting Proposition 39. Under that amendment, school districts must provide to charter schools established within their jurisdiction school facilities with "conditions reasonably equivalent to those in which the [charter school] students would be accommodated if they were attending other public schools of the district." (§ 47614, subd. (b).) This case explores the practical meaning of this reasonable equivalence mandate.

Bullis Charter School filed a petition for writ of mandamus and a complaint alleging that the Los Altos School District (District) had violated the Act, as amended, by failing to offer and provide Bullis with facilities for the 2009–2010 school year that were reasonably equivalent to other public schools in the District. The District prevailed and Bullis challenges the

---

[1] Further statutory references are to the Education Code unless otherwise stated.

court's ruling here. Bullis argues that the District's offer of facilities was deficient, inter alia, because the District significantly understated the non-classroom space available to District-run schools in the comparison group; overstated the size of the Bullis facility; did not consider the size of the site offered to Bullis as compared with the sizes of school sites in the comparison group; understated the size of some of the comparison schools' buildings; and failed to consider or provide for certain facilities, such as childcare facilities, which existed at each of the comparison group schools.

We conclude that the District offer of facilities for the 2009–2010 school year did not comply with Proposition 39 or its implementing regulations. Proposition 39 mandates that facilities be "shared fairly" among all public school students, including charter school students (§ 47614, subd. (a)). The regulations specify that a school district—in responding to a Proposition 39 facilities request by offering "reasonably equivalent" facilities to the charter school—must (1) select appropriate district-run schools to use as a comparison group with the charter school, (2) consider three categories of space (teaching, specialized teaching, and nonteaching space) in the comparison group schools, and (3) consider the site size of the comparison schools. In making its facilities offer, the school district must make a good faith effort to consider and accurately measure *all* of the facilities of the comparison group schools and accurately describe the facilities offered to the charter school. It is only through such an approach that one can determine whether "reasonably equivalent" facilities have been offered by the school district.

The District, in its facilities offer here, excluded from consideration over *one million square feet* of collective nonclassroom space of the comparison group schools. Its past practice notwithstanding, the District failed even to consider total site size; had it done so, using its own methodology, its offer would have contained some 35 percent greater acreage. It overstated the facilities offered to Bullis by considering (1) a soccer field on a 100 percent basis even though its shared use made it available to the charter school for only 40 percent of the time, and (2) a multipurpose room as being District supplied, even though it was built, owned, and operated by Bullis. And the District used an arbitrary "standard" size figure for certain facilities (e.g., libraries), thereby understating the appropriate size of such facility to be offered to Bullis. Based upon these deficiencies in the aggregate, we hold that the facilities offer was inconsistent with the mandate of Proposition 39 that a school district conduct a fair assessment of the facilities needed by the in-district charter school students so that those facilities offered meet the reasonable equivalence standard. The court should have granted mandamus and declaratory relief making an affirmative finding that the District acted arbitrarily by failing to apply the proper legal standards in its facilities offer to Bullis, in violation of Proposition 39. Accordingly, we will reverse the judgment.

## PROCEDURAL BACKGROUND

Bullis filed this action against the District on June 10, 2009.[2] In its amended petition and complaint (Petition), Bullis sought (1) a writ of mandate compelling the District to provide it with "reasonably equivalent facilities" as required under the law, and (2) a declaration from the court that the District's offer of facilities for the 2009–2010 school year violated Proposition 39 and its implementing regulations.

Bullis alleged in the Petition that it was established in the Spring of 2003.[3] Although neighborhood parents brought charter petitions that were twice rejected by the District, they ultimately obtained approval of their petition from the Santa Clara County Office of Education (Board). The Board continues to serve as Bullis's chartering authority. Bullis alleged that since its opening for the 2004–2005 school year, it has been a highly successful public charter school for kindergarten through sixth grades (K-6). It has been operating since its inception in portable buildings located on a portion of the District-run Egan Junior High School campus (Egan site). Its facilities at the Egan site are "considerably smaller than, and otherwise incongruous with, facilities and space offered to comparison District-run schools." Because of its claimed success, Bullis applied to the Board in September 2008 for a revision to its charter to permit the addition of seventh and eighth grades; although opposed by the District, the Board granted the application.

In September 2008, Bullis submitted to the District its annual "Proposition 39 facilities request" for the 2009–2010 school year, which included enrollment projections and a request for facilities for a newly authorized seventh grade classroom. The District made a preliminary offer of facilities on January 30, 2009. Bullis responded by noting a series of claimed deficiencies with the preliminary offer, and on April 1, 2009, the District submitted its final offer of facilities for the 2009–2010 school year (Facilities Offer, or Offer). Both the Facilities Offer and the preliminary offer (attached to the Facilities Offer) utilized in the analysis five District-run elementary schools as comparison schools (i.e., Loyola, Covington, Almond, Santa Rita, and Gardner Bullis (Gardner)). The final Facilities Offer did not provide any facilities for a seventh grade. Bullis notified the District that it would occupy the facilities offered by the District, but continued to communicate its position that the District's Offer was deficient in that it failed to offer any facilities for the seventh grade and did not propose reasonably equivalent facilities for K-6.

---

[2] The named defendants in the action are the District, its board of trustees, and its superintendent, Tim Justus. For simplicity, unless otherwise indicated, all references to the District shall be deemed to include each of the defendants and respondents.

[3] We will sometimes refer to the allegations of the Petition in this paragraph and the succeeding two paragraphs without the prefatory "Bullis alleged" in order to avoid undue repetition of the phrase.

Bullis claimed in the Petition that the Facilities Offer violated the Act and Proposition 39. These violations included (1) failing to offer any seventh grade facilities; (2) omitting a significant amount of space at the five comparison schools; (3) treating facilities that Bullis shared with another school as if Bullis had full-time use; (4) including in its offer a multipurpose room which Bullis itself built, paid for, owned, and maintained; (5) charging Bullis for its own multipurpose room on the same pro rata per square foot basis as charged for indoor facilities the District itself provides; and (6) improperly imposing conditions in the Facilities Offer.[4] As a result, the District, in its Facilities Offer, placed Bullis on a site "little more than one-half the size of all other District elementary school sites."

The parties submitted substantial briefing and evidence in support of, and in opposition to, the Petition, including supplemental supporting and opposing papers. After hearing extensive argument, on November 24, 2009, the court issued an order denying the relief sought in the Petition. A judgment was thereafter entered in favor of the District, and Bullis filed a timely notice of appeal.

## DISCUSSION

### I. *Mootness*

The 2009–2010 school year had ended by the time appellate briefing was completed in this case. Because the issues on appeal concern whether the District's final offer of facilities for the 2009–2010 school year violated the Act and Proposition 39, we deemed the potential mootness of this case to be of significant prominence which warranted further briefing. (See *City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 479 [81 Cal.Rptr.3d 72] [mootness may be examined by appellate court on its own motion].) After considering the supplemental letter briefs of the parties, we conclude that this case is not moot. Moreover, even were we to find it moot, we would nonetheless exercise our discretion to decide the case because the issues are of sufficient public interest and are likely to recur.

---

[4] The District's failure to include any seventh grade facilities in the Facilities Offer was a significant area of contention below. While Bullis makes passing reference to this issue in its brief, it does not submit argument to the effect that the District's omission of such facilities was a violation of Proposition 39. Likewise, Bullis does not submit argument concerning whether the District may charge Bullis a pro rata share for the multipurpose room Bullis owns. Any appellate argument on these matters is thus forfeited. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal.Rptr. 115, 655 P.2d 317].)

 Our high court, in a case addressing constitutional challenges to statutes regulating the training and furnishing of guide dogs for blind persons, has explained the principles of mootness: " '[W]hen, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal. [Citations.]' [Citation.] . . . [S]ince it is established that the constitutionality of a statute may be tested [by a declaratory relief proceeding] . . . [citation], the general rule governing mootness becomes subject to the case-recognized qualification that an appeal will not be dismissed where, despite the happening of the subsequent event, there remain material questions for the court's determination. This qualification or exception has been applied to actions for declaratory relief upon the ground that the court must do complete justice once jurisdiction has been assumed [citation], and the relief thus granted may encompass future and contingent legal rights." (*Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541 [63 Cal.Rptr. 21, 432 P.2d 717], fn. omitted, quoting *Consol. etc. Corp. v. United A. etc. Workers* (1946) 27 Cal.2d 859, 863 [167 P.2d 725].)

Examples in which subsequent events have rendered a controversy moot are numerous. They include cases in which a legislative enactment eliminated the sole issue on appeal (*Sagaser v. McCarthy* (1986) 176 Cal.App.3d 288, 299 [221 Cal.Rptr. 746]); the child who was the subject of a guardianship order became an adult while the appeal was pending (*Estate of McSwain* (1917) 176 Cal. 287, 288 [168 P. 117]); and the parties settled the disputes arising out of an underlying contract while the appeal was pending (*Cappellino v. Moore* (1929) 207 Cal. 36, 38 [276 P. 575]). The mere passage of time after the entry of the judgment from which an appeal is taken may also render the controversy moot. (See, e.g., *Feder v. Lahanier* (1962) 200 Cal.App.2d 483, 484–485 [19 Cal.Rptr. 638].)

Even if a case is technically moot, the appellate court may nonetheless exercise its discretion to decide the case. Such an exercise of discretion may occur where the case "poses an issue of broad public interest that is likely to recur." (*In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737]; see also *Konig v. Fair Employment & Housing Com.* (2002) 28 Cal.4th 743, 745–746, fn. 3 [123 Cal.Rptr.2d 1, 50 P.3d 718].) This exception has been invoked in many instances in order to decide a case of continuing public interest. (See, e.g., *Johnson v. Hamilton* (1975) 15 Cal.3d 461, 465 [125 Cal.Rptr. 129, 541 P.2d 881] [observing that it has been "frequently held that a case is not mooted from the fact alone that the issue in the case is of no further immediate interest to the person raising it"]; *California Correctional Peace Officers Assn. v. State of California* (2000) 82 Cal.App.4th 294, 303–304 [98 Cal.Rptr.2d 302] ["There is ample precedent for resolving

important issues of substantial and continuing public interest that may otherwise evade review."].) And the public interest exception has been applied in the context of a mandamus proceeding. (*Baluyut v. Superior Court* (1996) 12 Cal.4th 826, 829–830, fn. 4 [50 Cal.Rptr.2d 101, 911 P.2d 1].)

Another exception to the mootness doctrine is where there is a distinct possibility that the controversy between the parties may recur. (*Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479 [98 Cal.Rptr.2d 202] (*Cucamongans United*).) A third exception exists "when a material question remains for the court's determination [citation]." (*Id.* at p. 480.)

In this instance, although the 2009–2010 school year has long since passed—as has, of course, the 2010–2011 school year—it is readily apparent to this court that the controversy raised by Bullis's Petition is one that possibly, if not probably, will recur. The process by which Bullis, like all other charter schools, must request facilities from the District is an annual one. (See § 47614, subd. (b)(2).)[5] We conclude that the controversy is not moot because of the likely recurrence of a similar controversy concerning a future Bullis facilities request. (*Cucamongans United, supra*, 82 Cal.App.4th at p. 479.)

Under similar circumstances, the court in *Environmental Charter High School v. Centinela Valley Union High School Dist.* (2004) 122 Cal.App.4th 139 [18 Cal.Rptr.3d 417] (*Environmental Charter High School*) applied this exception to the mootness doctrine. There, the charter school brought a mandamus proceeding challenging the denial of a facilities request based on the school district's claim that there was a lack of documentation in support of the request. (*Id.* at pp. 143, 144.) The charter school argued that the additional information sought by the district was confidential and could not be released without the consent of the parents of the prospective students. (*Id.* at p. 143.) After the trial court granted the petition and the school district appealed, the appellate court, notwithstanding that the school year in question had expired, concluded that the case was not moot "because the parties' dispute over application of the regulations to a facilities request is likely to recur." (*Id.* at p. 144.)

Furthermore, even were we to find the recurrence of this controversy between the parties to be unlikely, we believe this case presents issues of

---

[5] We are cognizant that the Board recently renewed Bullis's charter for an additional five-year period, through June 2017. (See Noguchi, *Charter renewed, frustrating critics*, San Jose Mercury News (Oct. 7, 2011) p. B2.) Thus, there are at least five years in which the same or similar controversies between the parties concerning Bullis's right to receive reasonably equivalent facilities may potentially recur.

broad public interest that are likely to recur. There are hundreds of charter schools currently operating in this state. At least according to one source—amicus curiae California Charter Schools Association—there are currently 912 California charter schools. (See <http://www.calcharters.org/2010/11/2010-11-new-charter-schools-fact-sheet.html> [as of Oct. 27, 2011].) Issues concerning the manner in which school district facilities are allocated to charter schools under Proposition 39 are therefore undoubtedly of broad interest to the charter schools and the school districts receiving facilities requests. Further, there have to date been no published decisions specifically addressing a charter school's claim that a school district's reasonable equivalence analysis did not satisfy the requirements of Proposition 39. We therefore exercise our discretion (*Save Stanislaus Area Farm Economy v. Board of Supervisors* (1993) 13 Cal.App.4th 141, 147 [16 Cal.Rptr.2d 408]) to invoke the public interest exception to decide this case, notwithstanding the fact that the passage of time (i.e., the 2009–2010 school year) may have otherwise rendered this appeal moot.

## II. *Mandamus and Standard of Review*

In a traditional mandamus action, an extraordinary writ may issue "to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . ." (Code Civ. Proc., § 1085, subd. (a).) "The availability of writ relief to compel a public agency to perform an act prescribed by law has long been recognized. [Citation.] [¶] What is required to obtain writ relief is a showing by a petitioner of '(1) A clear, present and usually ministerial duty on the part of the respondent . . . ; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty . . . .' [Citations.]" (*Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 539–540 [28 Cal.Rptr.2d 617, 869 P.2d 1142], superseded by statute as stated in *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1077 [29 Cal.Rptr.3d 234, 112 P.3d 623].) Courts have defined a ministerial act as " 'an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists.' [Citation.]" (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916 [129 Cal.Rptr.2d 811, 62 P.3d 54].) "Thus, '[w]here a statute or ordinance clearly defines the specific duties or course of conduct that a governing body must take, that course of conduct becomes mandatory and eliminates any element of discretion.' [Citation.]" (*Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1267 [4 Cal.Rptr.3d 536]; see, e.g., *Doe v. Albany Unified School Dist.* (2010) 190 Cal.App.4th 668, 682 [118 Cal.Rptr.3d 507] [Ed. Code requiring districts to provide minimum

number of hours of physical education imposed ministerial duty on district enforceable through mandamus].)

█ Courts have recognized implicitly the right to enforce through traditional mandamus proceedings a school district's obligations under Proposition 39. For instance, in *Sequoia Union High School Dist. v. Aurora Charter High School* (2003) 112 Cal.App.4th 185, 195 [5 Cal.Rptr.3d 86] (*Sequoia*), the court found mandamus relief appropriate in order for a charter school to compel a school district to provide it with "reasonably equivalent" facilities as required under section 47614, subdivision (b). And in *Ridgecrest Charter School v. Sierra Sands Unified School Dist.* (2005) 130 Cal.App.4th 986, 991–992 [30 Cal.Rptr.3d 648] (*Ridgecrest*), a charter school was ultimately successful in seeking mandamus to compel a school district, which had made a Proposition 39 facilities offer that included classrooms at five separate locations, to comply with its duty under section 47614, subdivision (b) of providing a charter school with "contiguous" facilities.

Our high court has described the appropriate level of judicial scrutiny of agency action " 'in any particular case is perhaps not susceptible of precise formulation, but lies somewhere along a continuum with nonreviewability at one end and independent judgment at the other.' [Citation.] Quasi-legislative administrative decisions are properly placed at that point of the continuum at which judicial review is more deferential; ministerial and informal actions do not merit such deference, and therefore lie toward the opposite end of the continuum." (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 575–576 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) The First District Court of Appeal has enunciated some guiding principles for our consideration of this appeal: "Courts exercise limited review in ordinary mandamus proceedings. They may not reweigh the evidence or substitute their judgment for that of the agency. They uphold an agency action unless it is arbitrary, capricious, lacking in evidentiary support, or was made without due regard for the petitioner's rights. [Citations.] However, courts must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute. [Citation.] Because trial and appellate courts perform the same function in mandamus actions, an appellate court reviews the agency's action de novo. [Citation.]" (*Sequoia, supra,* 112 Cal.App.4th at p. 195.)

The District argues, belatedly,[6] that the de novo standard of review enunciated in *Sequoia* is inapplicable here. Rather, it contends that—because

---

[6] After the filing of the opinion, the District filed a petition for rehearing raising arguments and citing authorities it failed to present before the case was argued and decided. (Indeed, the District cited 39 cases in the petition that it had not cited in the respondents' brief.) To the extent that the petition raises new arguments and cites new authorities, it is improper. (See

the matter was decided below on disputed facts—this court must review whether the trial court's findings and judgment " 'are supported by substantial, credible and competent evidence.' [Citation.]" (*Environmental Charter High School, supra*, 122 Cal.App.4th at p. 145.) We disagree with the District that such a review standard applies here.

It is true that where a court's ruling on a traditional writ of mandate is founded on a resolution of conflicting evidence, the appellate court's "inquiry [is] whether the findings and judgment of the trial court are supported by substantial evidence." (*Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 700 [41 Cal.Rptr.2d 352].) " 'However, the appellate court may make its own determination when the case involves resolution of questions of law where the facts are undisputed.' [Citation.]" (*Agosto v. Board of Trustees of Grossmont-Cuyamaca Community College* (2010) 189 Cal.App.4th 330, 336 [118 Cal.Rptr.3d 300]; see Cal. Civil Writ Practice (Cont.Ed.Bar 4th ed. 2011) § 11.16, pp. 256–257.) The interpretation of a statute is a question of law subject to independent review. (*Farahani v. San Diego Community College Dist.* (2009) 175 Cal.App.4th 1486, 1491 [96 Cal.Rptr.3d 900]; see also *Branciforte Heights, LLC v. City of Santa Cruz* (2006) 138 Cal.App.4th 914, 933 [42 Cal.Rptr.3d 96].)

Notwithstanding the District's belated attempt in its rehearing petition to characterize the trial court's decision as one involving a resolution of disputed facts, it is clear that the matter here involves an interpretation of Proposition 39 and its implementing regulations, and their application to the District's Facilities Offer.[7] The principal issues, as discussed, *post*, concern the propriety of the methodology employed by the District in the creation of

---

*Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1092 [32 Cal.Rptr.3d 483, 116 P.3d 1162], abrogated on other grounds in *Martinez v. Combs* (2010) 49 Cal.4th 35, 66 [109 Cal.Rptr.3d 514, 231 P.3d 259] [" 'arguments . . . cannot be raised for the first time in a petition for rehearing' "]; *Midland Pacific Building Corp. v. King* (2007) 157 Cal.App.4th 264, 276 [68 Cal.Rptr.3d 499] [same].) We nonetheless have chosen to address the standard of review question raised in the District's petition.

[7] Although it was argued repeatedly in the respondents' brief that the appellate court was precluded from reweighing the evidence or substituting its judgment for that of the agency's, the District did not argue in its brief that the trial court's decision was based upon a resolution of evidentiary disputes and that therefore our review of that decision was limited to determining whether there was substantial evidence to support it. At oral argument, when asked whether the case at trial turned on the truth or falsity of claims made by the parties, the District's counsel acknowledged that it did not and that it was "a legal issue" at stake here. The fact that the controversy centered on the methodology used by the District in the Facilities Offer—and that the case below did not turn on the resolution of factual disputes concerning the objective measurement of certain relevant space at the comparison group schools or at the Egan site—was underscored further at oral argument. The District's counsel, responding to a question of the court, conceded that there was no factual dispute at the trial level concerning the accuracy of square footage numbers (listed in Bullis's opening brief) reflecting space at the comparison group schools the District excluded in its Proposition 39 analysis.

the Facilities Offer—i.e., the exclusion of nonclassroom space of the comparison group schools, the inclusion among the facilities offered to the charter school of a soccer field used by Bullis only two days a week without proration due to its shared use, the failure to consider site size of the comparison group schools, the use of standard room sizes for certain rooms at the comparison group schools, and the failure to consider certain facilities (such as before- and after-school childcare facilities) available at each of the comparison group schools. The District confuses disputes over the appropriate methodology for a Proposition 39 facilities offer that *did* exist and are at the heart of the controversy with disputes as to material facts (e.g., the objective measurements of the comparison group schools and the Egan site) which did *not* exist. The de novo standard of review enunciated in *Sequoia, supra*, 112 Cal.App.4th at page 195 is therefore appropriate here.

III. *The Act, Proposition 39, and Implementing Regulations*

A. *The Act*

The Legislature adopted the Act in 1992 for the express purpose of "provid[ing] opportunities for teachers, parents, pupils, and community members to establish and maintain schools that operate independently from the existing school district structure . . . ." (§ 47601.) The Act had six stated goals: (1) improving student learning; (2) increasing opportunities for learning and expanding learning experiences, particularly for low-achieving students; (3) fostering teaching techniques that are different and innovative; (4) developing new teaching opportunities, including the opportunity to be responsible for learning programs at the charter school; (5) giving expanded choices in educational opportunities to parents and students beyond those available in the public school system; and (6) making charter schools accountable for achieving measurable student outcomes. (§ 47601, subds. (a)–(f).) When it amended the Act in 1998, the Legislature identified a seventh goal of affording robust competition within the public school system to encourage ongoing improvements for all public schools. (§ 47601, subd. (g), added by Stats. 1998, ch. 34, § 1, pp. 193–194.)

The Act has survived constitutional challenge. In *Wilson v. State Bd. of Education* (1999) 75 Cal.App.4th 1125 [89 Cal.Rptr.2d 745] (*Wilson*), taxpayers asserted various constitutional challenges to the Act and amendments to it. The First District Court of Appeal, Division Four, rejected each of those challenges, including contentions that the 1998 amendments to the Act violated article IX, section 5 of the state Constitution in that they reflected the Legislature's abdication of control over public education functions (*Wilson*, at pp. 1134–1136), and gave operational independence to charter schools contrary to the constitutional mandate that the Legislature "provide a 'system of

common schools' " (*id.* at p. 1136). As to the latter claim, the court observed that the Legislature in the 1998 amendment to the Act "explicitly found that charter schools are (1) part of the article IX 'Public School System'; (2) under its jurisdiction; and (3) entitled to full funding. (§ 47615, subd. (a).)" (*Wilson,* at p. 1137.) *Wilson* held that the Act met the constitutional mandate of uniformity within the public school system because it required that charter schools receive funding comparable to other public schools, hire teachers meeting the same minimum requirements as other public school teachers, maintain programs designed to meet state standards, and have their students' progress assessed under the same approach as other public school students. (75 Cal.App.4th at p. 1138.)

### B. *Proposition 39*

California voters in November 2000 approved Proposition 39, which included amending section 47614. That statute had previously imposed a limited obligation upon a school district to provide facilities to charter schools: A district was required to provide to a charter school operating in its district, "at no charge, facilities not currently used by the school district for instructional or administrative purposes, or that have not been historically used for rental purposes." (Former § 47614, added by Stats. 1998, ch. 34, § 15, pp. 202–203.) Proposition 39—containing the recital of the voters' intent "that public school facilities should be *shared fairly* among all public school pupils, including those in charter schools" (§ 47614, subd. (a), italics added)—significantly changed this obligation. (See *California School Bds. Assn. v. State Bd. of Education* (2010) 191 Cal.App.4th 530, 540–541 [119 Cal.Rptr.3d 596].) Instead of requiring each district to provide its castoff school property to charter schools at no cost, the voter-approved amendment provided in part: "Each school district shall make available, to each charter school operating in the school district, facilities sufficient for the charter school to accommodate all of the charter school's in-district students *in conditions reasonably equivalent* to those in which the students would be accommodated if they were attending other public schools of the district. Facilities provided shall be contiguous, furnished, and equipped, and shall remain the property of the school district. The school district shall make reasonable efforts to provide the charter school with facilities near to where the charter school wishes to locate, and shall not move the charter school unnecessarily." (§ 47614, subd. (b), italics added.)[8]

Proposition 39 had the effect of requiring districts to "make facilities available to charter schools operating in the district that will accommodate all

---

[8] School districts' obligations to provide facilities to charter schools under Proposition 39 took effect three years after the November 2000 effective date of the proposition. (§ 47614, subd. (b)(3).)

the charter school's in-district students." (*Sequoia, supra,* 112 Cal.App.4th at pp. 189–190, fn. omitted.) As our colleagues in the Fifth District Court of Appeal have aptly explained, "These 'shared fairly,' 'reasonably equivalent,' and 'contiguous' provisions seem clearly to require a district, in responding to a Proposition 39 facilities request, to give the same degree of consideration to the needs of charter school students as it does to the students in district-run schools." (*Ridgecrest, supra,* 130 Cal.App.4th at p. 999, fn. omitted.)

The proposition established a procedural mechanism by which a charter school could make an annual facilities request to the school district in which the school operated, including in the request "a reasonable projection of the charter school's average daily classroom attendance by in-district students for the following year." (§ 47614, subd. (b)(2).) Districts were given the discretion to deny requests where the charter school projected less than 80 units of average daily attendance. (§ 47614, subd. (b)(4).) A charter school must make a showing of its enrollment projections with relevant supporting documentation in presenting its Proposition 39 facilities request to the school district. (*Environmental Charter High School, supra,* 122 Cal.App.4th at p. 153.) The Act, however, does not require the charter school to make its enrollment projections with "arithmetical precision." (*Sequoia, supra,* 112 Cal.App.4th at p. 196.)

### C. *Implementing Regulations*

Proposition 39 also required the State Department of Education to propose, and gave the State Board of Education the authority to adopt, regulations to implement the amendment to section 47614, including regulations defining (among other terms), " 'conditions reasonably equivalent,' " and specifying annual facilities request procedures. (§ 47614, subd. (b)(6).) The State Board of Education in 2002 adopted regulations implementing the provisions of section 47614. (Cal. Code Regs., tit. 5, § 11969.1 et seq.)[9] New regulations were adopted by the State Board of Education in 2008.

One regulation adopted by the State Board of Education—regulation 11969.3, which is at the heart of this controversy—specifically addresses a school district's obligation to provide facilities to a charter school "sufficient . . . to accommodate all of the charter school's in-district students in conditions reasonably equivalent to [facilities they would receive] if they were attending other public schools of the district," as provided under section 47614, subdivision (b). Subdivisions (a) through (c) of regulation 11969.3 specify the school district's methodology for conducting a reasonable equivalency analysis in responding to a charter school's facilities request.

---

[9] Further references to "regulation" or "reg." are to sections under title 5 of the California Code of Regulations.

Regulation 11969.3, subdivision (a)(1), provides that "[t]he standard for determining whether facilities" offered to a charter school satisfy the statute's reasonable equivalency requirement "shall be a comparison group of district-operated schools with similar grade levels." As discussed in part IV.D., *post*, there are two, apparently alternative methods of determining the comparison group. (Reg. 11969.3, subd. (a)(2), (3).)

Subdivision (b) of regulation 11969.3 (captioned "Capacity") describes three categories of facilities a school district shall consider in its reasonable equivalence analysis.[10] A school district shall provide "teaching stations," "specialized classroom space," and "non-teaching station space," based upon methods of correlating the comparison group schools' facilities with the average daily attendance (ADA) of the students living in the district projected to attend the charter school. (Reg. 11969.3, subd. (b).)

Regulation 11969.3, subdivision (c) (captioned "Condition") identifies the factors a school district must consider in determining "whether the condition of facilities provided to a charter school is reasonably equivalent to the condition of comparison group schools."[11] Included among those listed ·

---

[10] Subdivision (b) of regulation 11969.3 reads in part: "(b) Capacity. [¶] (1) Facilities made available by a school district to a charter school shall be provided in the same ratio of teaching stations (classrooms) to ADA as those provided to students in the school district attending comparison group schools. School district ADA shall be determined using projections for the fiscal year and grade levels for which facilities are requested. Charter school ADA shall be determined using in-district classroom ADA projected for the fiscal year and grade levels for which facilities are requested. . . . [¶] (2) If the school district includes specialized classroom space, such as science laboratories, in its classroom inventory, the space allocation provided pursuant to paragraph (1) of subdivision (b) shall include a share of the specialized classroom space and/or a provision for access to reasonably equivalent specialized classroom space. The amount of specialized classroom space allocated and/or the access to specialized classroom space provided shall be determined based on three factors: [¶] (A) the grade levels of the charter school's in-district students; [¶] (B) the charter school's total in-district classroom ADA; and [¶] (C) the per-student amount of specialized classroom space in the comparison group schools. [¶] (3) The school district shall allocate and/or provide access to non-teaching station space commensurate with the in-district classroom ADA of the charter school and the per-student amount of non-teaching station space in the comparison group schools. Non-teaching station space is all of the space that is not identified as teaching station space or specialized classroom space and includes, but is not limited to, administrative space, kitchen, multi-purpose room, and play area space. If necessary to implement this paragraph, the district shall negotiate in good faith with the charter school to establish time allocations and schedules so that educational programs of the charter school and school district are least disrupted."

[11] Subdivision (c)(1) of regulation 11969.3 reads in its entirety: "(c) Condition. [¶] (1) All of the factors listed below shall be used by the school district and charter school to determine whether the condition of facilities provided to a charter school is reasonably equivalent to the condition of comparison group schools. Condition is determined by assessing such factors as age (from latest modernization), quality of materials, and state of maintenance. [¶] (A) School site size. [¶] (B) The condition of interior and exterior surfaces. [¶] (C) The condition of mechanical, plumbing, electrical, and fire alarm systems, including conformity to applicable

factors are the size of the school site (reg. 11969.3, subd. (c)(1)(A)), and the condition of play areas and athletic fields (reg. 11969.3, subd. (c)(1)(G)).

Regulation 11969.9 provides the procedure by which a charter school applies to a school district annually for facilities, and the school district responds to such a facilities request. The charter school must make a written request by November 1 of the preceding fiscal year (reg. 11969.9, subd. (b)), and the request must include, inter alia, a reasonable projection of its in-district students for the succeeding year and the method by which the projection was derived. (Reg. 11969.9, subd. (c)(1).) The school district may object to any of the charter school's projections (reg. 11969.9, subd. (d)), and the charter school may respond to those objections (reg. 11969.9, subd. (e)) within specified times. The district must prepare by February 1 a written preliminary proposal for facilities. (Reg. 11969.9, subd. (f).) "At a minimum, the preliminary proposal shall include (1) the projections of in-district classroom ADA on which the proposal is based, (2) the specific location or locations of the space, (3) all conditions pertaining to the space, including a draft of any proposed agreement pertaining to the charter school's use of the space, and (4) the projected pro rata share amount and a description of the methodology used to determine that amount. The district shall also provide the charter school a list and description of the comparison group schools used in developing its preliminary proposal, and a description of the differences between the preliminary proposal and the charter school's facilities re-quest . . . ." (*Ibid.*) The charter school may respond to the preliminary proposal by March 1 (reg. 11969.9, subd. (g)), and by April 1, the district must submit its final written offer of facilities, responding to any concerns or counterproposals by the charter school, and identifying specifically, among other things, "the teaching station, specialized classroom space, and non-teaching station space offered for the exclusive use of the charter school and the teaching station, specialized classroom space, and non-teaching station space to which the charter is to be provided access on a shared basis with district-operated programs; [¶] [and] for shared space, the arrangements for sharing . . . ." (Reg. 11969.9, subd. (h)(1) & (2).)

IV. *Compliance of District's Facilities Offer with Proposition 39*

A. *Introduction*

Bullis contends that the District violated Proposition 39, as elucidated by the implementing regulations, by failing to provide facilities for the

codes. [¶] (D) The availability and condition of technology infrastructure. [¶] (E) The condition of the facility as a safe learning environment including, but not limited to, the suitability of lighting, noise mitigation, and size for intended use. [¶] (F) The condition of the facility's furnishings and equipment. [¶] (G) The condition of athletic fields and/or play area space."

2009–2010 school year "sufficient for the charter school to accommodate all of [Bullis's] in-district students in conditions reasonably equivalent to those in which the students would be accommodated if they were attending other public schools of the district." (§ 47614, subd. (b).) It argues that the District's analysis in its Facilities Offer was flawed in a number of respects, and that these flaws, individually and collectively, had the effect of falsely describing the facilities proposed to Bullis that would be reasonably equivalent under Proposition 39.

These claimed flaws in the District's analysis consist in (1) the exclusion of large portions of the outdoor space at the five schools in the comparison group, thereby significantly understating that space; (2) giving insufficient consideration to Bullis's overall site size in relation to the total acreage of each of the comparison group schools, thereby ignoring the fact that the Egan site offered to Bullis was significantly smaller than the comparison schools' sites; (3) the incorrect selection of five schools for the comparison group, rather than the three comparison schools in which the largest number of charter school students reside, thereby deflating the acres-per-student needed by Bullis students; (4) overstating the size of the facilities offered to Bullis; (5) the improper use of "standard room" sizes instead of actual room sizes for certain rooms (e.g., libraries), thereby decreasing the room sizes needed by Bullis; and (6) failing to provide a before- and after-school childcare facility that was available to each of the schools in the comparison group. We will examine each of these claims below in the context of evaluating whether the District satisfied its ministerial duty of providing a facilities offer that met Proposition 39's requirement that Bullis's in-district students be offered and provided "reasonably equivalent" facilities.[12]

### B. *Outdoor Space at Comparison Schools*

Bullis contends the District's Proposition 39 analysis was flawed because it significantly understated the amount of exterior space for each of the five schools in the comparison group. It argues that under the regulations, and in particular regulation 11969.3, all space, such as the outdoor "non-teaching

---

[12] The District has requested that we take judicial notice of various documents, namely, two newspaper articles, the District's financial report, the Governor's budget summary (fiscal year 2011–2012), and other documents regarding California's public schools. These documents were not part of the record considered below by the trial court. The District's request for judicial notice is therefore denied. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [58 Cal.Rptr.2d 899, 926 P.2d 1085] [appellate courts generally refuse to take judicial notice of evidence not presented to trial court]; see also *Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP* (2010) 184 Cal.App.4th 313, 332, fn. 9 [109 Cal.Rptr.3d 143] [same].) Bullis's conditional request for judicial notice—in which it sought judicial notice of three documents *only if* its objections to the District's judicial notice request were overruled—is likewise denied.

station space," must be considered, and the District may not exclude portions of the comparison group schools'. outdoor space due to its belief that the excluded space was unusable (or for any other reason).

### 1. *Evidence*

The Facilities Offer included a chart that, among other things, listed the outdoor space at each of the five comparison group schools; the space categories were described separately as "K play area," "non-K blacktop," and "Turf area." The chart also included a calculation of the average square footage for each of the three outdoor categories based upon the figures for the five comparison group schools.

Bullis presented evidence that large amounts (*over 50 percent*) of exterior square footage were not included in the District's calculations, thereby understating the actual amount of outdoor space at the comparison schools. Bullis's evidence may be summarized in the following table:

### Table 1—Total Outdoor Space—Five Comparison Group Schools (square feet)

| Comparison Group School | Bullis's Evidence | District Reported | Difference | Space Excluded | Average (Actual) | Average (District Reported) |
|---|---|---|---|---|---|---|
| Almond | 355,289 | 220,958 | 134,331 | 38% | | |
| Loyola | 337,866 | 154,818 | 183,048 | 54% | | |
| Covington | 497,198 | 146,769 | 350,429 | 70% | | |
| Gardner | 365,652 | 106,070 | 259,582 | 71% | | |
| Santa Rita | 409,740 | 238,707 | 171,033 | 42% | | |
| Total | 1,965,745 | 867,322 | 1,098,423 | 56% | | |
| | | | | | 393,149 | 173,464[13] |

In addition to Bullis showing the total outdoor space for each of the comparison group schools, it presented evidence of the amount of actual "K play area," "non-K blacktop," and "Turf area" for the five schools. The following table presents this "apples-to-apples" comparison between the calculations in the Facilities Offer and those presented by Bullis—showing that the District's figures generally were understated:

---

[13] The 173,464 square feet of average outdoor space for the comparison group schools was listed by the District in the Facilities Offer as 7,977 (K play area), 56,164 (non-K blacktop), and 109,323 (Turf area). Also, two of the figures in the "District reported" column (i.e., for Almond and Santa Rita) differ slightly from the figures reported in the evidence submitted by Bullis through the declaration of Ken Smith. The figures we list are derived from the District's Facilities Offer.

### Table 2—Outdoor Space (K Play, Non-K Blacktop, Turf)—Five Comparison Group Schools (square feet)

| | Almond | Loyola | Covington | Gardner | Santa Rita | Average |
|---|---|---|---|---|---|---|
| **Bullis's Evidence** | | | | | | |
| *K* | 12,223 | 9,490 | 16,057 | 12,310 | 6,211 | 11,258 |
| *Non-K* | 78,129 | 58,979 | 57,578 | 51,257 | 55,992 | 60,387 |
| *Turf* | 144,586 | 101,924 | 128,933 | 50,485 | 210,668 | 127,319 |
| *Total* | 234,988 | 170,393 | 202,568 | 114,052 | 272,871 | 198,964 |
| **District Reported** | | | | | | |
| *K* | 10,387 | 5,557 | 7,635 | 10,300 | 6,007 | 7,977 |
| *Non-K* | 78,446 | 57,588 | 54,217 | 46,640 | 43,930 | 56,164 |
| *Turf* | 132,125 | 91,673 | 84,917 | 49,130 | 188,770 | 109,323 |
| *Total* | 220,958 | 154,818 | 146,769 | 106,070 | 238,707 | 173,464 |

The District's Offer included the square footage of these three areas of outdoor space proposed to Bullis—6,850 (K), 49,330 (non-K), and 91,410 (turf). The understatement of the comparison group schools' square footage of these three areas obviously reduced the actual gap between the average space at the comparison schools and the analogous space offered to Bullis.

Randall Kenyon, assistant superintendent of the District, testified that much of the comparison schools' exterior space, which he generally described as "unusable areas," was not included in the Proposition 39 analysis for the 2009–2010 school year. This excluded space included landscaping, "hilly unusable area," picnic tables, and walkways (at Covington); a large sloped area, other flat landscaped areas, a lunch area, and a childcare area (at Gardner); a playground, landscaping, blacktop between buildings and a field, lunch areas, a garden, a play structure, and bicycle racks (at Loyola); and an outdoor amphitheatre, a play structure, landscaping, and lunch areas (at Santa Rita).[14]

Lawrence Schadt, an architect hired by the District, confirmed in his deposition that he was instructed by Kenyon to perform square footage calculations of only discrete portions of exterior space of the five schools in

---

[14] Notwithstanding Kenyon's testimony that there was only about seven acres of "usable space" at the Gardner facility, Kenyon reported in January 2009 to the State Department of Education that Gardner had 10 "TOTAL USABLE ACRES."

the comparison group.[15] In one instance, after providing calculations to Kenyon, Schadt sent some revised figures pertaining to certain areas that were "recalculated . . . per [Kenyon's] request," including a reduction by nearly 10,000 square feet of a blacktop area at Santa Rita. Schadt testified that he excluded outside areas of the comparable schools such as portions of the baseball field, a play area, an outdoor amphitheatre, and blacktop areas with trees and benches between classroom buildings at Covington; a large park area of about 60,000 square feet at Santa Rita; turf and lunch areas at Gardner; and areas adjacent to classrooms, and a concrete area at Loyola.[16]

Bullis also presented evidence that the turf areas for three of the comparison group schools as reported in the Facilities Offer were significantly smaller than the District's figures in its Proposition 39 facilities offers for prior school years.[17] Beginning in the 2008–2009 facilities offer and continuing in the subject 2009–2010 Facilities Offer, the turf areas for Almond, Covington, and Santa Rita decreased by the following square footage: 26,875 (Almond); 42,083 (Covington); and 16,830 (Santa Rita). Kenyon was unable to explain in his deposition the reason for the decrease in the turf square footage figures for these three schools in the comparison group.

### 2. *Discussion of claim*

 As noted, regulation 11969.3, subdivision (b)(3) requires that the school district provide "non-teaching station space" to a charter school that is "commensurate with the in-district classroom ADA of the charter school and the per-student amount of non-teaching station space in the comparison group schools." The regulations require further that the district, in its preliminary offer, provide the charter school with "a list and description of the comparison group schools used in developing its preliminary proposal . . . ." (Reg. 11969.9, subd. (f).) And subdivision (h) of regulation 11969.9 requires that the school district, in its final facilities proposal, "specifically identify" the nonteaching station space offered to the charter school.

Notwithstanding the apparently clear mandate of the implementing regulations, the District in the Facilities Offer here does not "allocate and/or provide

---

[15] For example, in one e-mail dated March 7, 2008, Kenyon requested that Schadt provide square footage calculations for the following areas at Gardner: "The areas are **turf** (the existing field, not anything else), **K play area** (the area excluding the grass), and **other blacktop** (the elevated blacktop area in the back and other blacktop areas)." (Original boldface.)

[16] Schadt testified that he did not include the whitetop area at Loyola in his calculations because "it's concrete, not blacktop."

[17] As discussed in part IV.D., *post*, prior to the 2008–2009 school year, the District used three schools in the comparison group, rather than five, in reasonable equivalence analyses supporting its facilities offers to Bullis.

access to non-teaching station space" to Bullis based upon its in-district classroom ADA and the per-student amount of such space in the comparison group schools, as required under regulation 11969.3, subdivision (b)(3). Instead, the District identifies *a much smaller subset* of the nonteaching station space—namely, K play area, non-K blacktop, and turf area. It then provides measurements and averages of those three areas at the comparison group schools, and formulates its Offer to Bullis based upon those three subcategories of space within the nonteaching station space category.[18] The District's claimed justification for its approach is twofold.

First, the District contends that in the case of nonclassroom facilities, it need only consider those that are common to each of the schools in the comparison group. Under this view, for example, if all five comparison group schools had tennis courts, the area would be deemed nonteaching station space; but if one or more of the comparison group schools did not have tennis courts, the area would not be considered in the reasonable equivalence analysis.

█ There is no support in the regulations for this viewpoint. The District's approach would allow a comparison group school's subjective use determination of its nonclassroom space to control the analysis. For instance, using the above example, if all five schools had tennis courts, but one school chose to use the area for badminton only, in the District's view, the space would not be considered in the Proposition 39 analysis. Likewise, if one school discontinued a previous use of space that was common to the other comparison group schools, the space would no longer be factored into the district's reasonable equivalence evaluation, notwithstanding the absence of any reduction in the nonclassroom space being considered. This common usage approach could lead to—as has occurred here—the exclusion of a substantial amount of nonteaching station space from the analysis, to the potential detriment of the charter school. We believe that a school district, in determining the amount of nonteaching station space it must allocate to the charter school, must take an objective look at all of such space available at the schools in the comparison group. A school district may achieve the mandate under Proposition 39 and the regulations of "giv[ing] the same degree of consideration to the needs of charter school students as it does to the students in district-run schools" (*Ridgecrest, supra*, 130 Cal.App.4th at p. 999, fn. omitted; see also reg. 11969.2, subd. (d)) only if it considers the entire nonclassroom space in the facilities offer.

---

[18] We acknowledge that the Facilities Offer, in addition to K play, non-K blacktop, and turf, identifies two other small areas of nonteaching station space (bathrooms and "Storage/Custodial/Servery Space") that it provides to Bullis, totaling about 1,700 square feet. Our concern here focuses on the large amount of outdoor space at the comparison group schools which the District did not consider as nonteaching station space area.

Second, the District, invoking the doctrine of *ejusdem generis*, argues that the term "non-teaching station space" in regulation 11969.3, subdivision (b)(3) is limited by the examples given in the regulation. Subdivision (b)(3) of regulation 11969.3 provides: "Non-teaching station space is all of the space that is not identified as teaching station space or specialized classroom space and includes, but is not limited to, administrative space, kitchen, multi-purpose room, and play area space." The District contends that—rather than constituting a catchall category of space which is neither teaching station nor specialized classroom space—"non-teaching station space" "must be construed to include only those within the same class as those that are explicitly enumerated (*i.e.*, 'administrative space, kitchen, multi-purpose room and play area space[]')." We disagree.

■ As our high court has explained, "The principle of *ejusdem generis* holds that ' "where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. [It] is based on the obvious reason that if the [writer] had intended the general words to be used in their unrestricted sense, [he or she] would not have mentioned the particular things or classes of things which would in that event become mere surplusage." ' [Citation.]" (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1160 [278 Cal.Rptr. 614, 805 P.2d 873], fn. omitted (*Harris*), superseded by statute on another point as stated in *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 664–665 [94 Cal.Rptr.3d 685, 208 P.3d 623].) The doctrine is employed as an interpretive aid where the language is ambiguous. (*The Zumbrun Law Firm v. California Legislature* (2008) 165 Cal.App.4th 1603, 1619 [82 Cal.Rptr.3d 525] (*Zumbrun*).) Use of the *ejusdem generis* doctrine is inappropriate where to do so "would frustrate the intent underlying the statute." (*Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1012 [9 Cal.Rptr.2d 358, 831 P.2d 798].)

Thus, *ejusdem generis* is not a doctrine of inflexible application. As we have explained: "The rule of *ejusdem generis* assumes that the general term chosen by the Legislature conveys a relatively 'unrestricted sense.' Sometimes this is so; sometimes it is not. The rule also supposes that the operative characteristics of the enumerated things may be readily discerned from the face of the statute, but that is not necessarily the case. With or without *ejusdem generis*, the real intent of an inclusive or expansive clause must ordinarily be derived from the statutory context and, if necessary, other permissible indicia of intent. *Ejusdem generis*, with its emphasis on abstract semantical suppositions, may do more to obscure than disclose the intended scope of the clause." (*O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423, 1462 [44 Cal.Rptr.3d 72].)

██ We decline to employ the doctrine as urged by the District here. We do not find the challenged definitional language of "non-teaching station space" to be ambiguous. The regulation clearly denotes that the term means "*all* of the space that is not identified as teaching station space or specialized classroom space." (Reg. 11969.3, subd. (b)(3), italics added.) As such, the regulation defines the term as *all* space other than space having the two other classifications delineated in subdivision (b) of regulation 11969.3. This straightforward formula for determining what is "non-teaching station space" would be obscured by construing the four specific examples that follow the "all of the space . . ." language in the regulation ("includes, but is not limited to, administrative space, kitchen, multi-purpose room, and play area space") (*ibid.*) as somehow limiting the definition to only *certain* space that is neither teaching station nor specialized classroom space. (See, e.g., *Ortega Rock Quarry v. Golden Eagle Ins. Corp.* (2006) 141 Cal.App.4th 969, 980 [46 Cal.Rptr.3d 517] [rejecting application of *ejusdem generis* doctrine to narrowly construe definition of all pollutants in pollution exclusion in insurance policy; use of " 'including' " followed by list of examples did not limit term to same class as listed examples].) This is simply not an instance where the regulation's draftsperson identified four examples as a means of limiting the general term. (*Harris, supra,* 52 Cal.3d at p. 1160.) Rather, by using the phrase "all of the space . . . ," the draftsperson intended that "non-teaching station space" have a meaning that was unrestricted by the specific examples following it in the regulation.

Moreover, the adoption of *ejusdem generis* would frustrate the intent of Proposition 39 and its implementing regulations. Allowing a school district to allocate only some portion of nonclassroom space to a charter school based upon an evaluation of limited areas of the comparison group schools would be contrary to the intent of the voters adopting Proposition 39 that school district facilities be "shared fairly" among all public school pupils. (§ 46714, subd. (a).) The doctrine of *"ejusdem generis* ' "is by no means a rule of universal application, and its use is to carry out, not to defeat, the legislative intent. When it can be seen that the particular word by which the general word is followed was inserted, not to give a coloring to the general word, but for a distinct object, and when, to carry out the purpose of the statute, the general word ought to govern, it is a mistake to allow the *ejusdem generis* rule to pervert the construction." ' [Citation.]" (*Zumbrun, supra,* 165 Cal.App.4th at pp. 1619–1620.)

The approach in the Facilities Offer of excluding significant amounts of nonclassroom space from the District's reasonable equivalence analysis violated Proposition 39 and its implementing regulations. The practice was

inconsistent with the District's obligation of identifying, offering, and providing facilities sufficient to accommodate Bullis's in-District students in conditions reasonably equivalent to facilities they would have received had they elected to attend District-run schools. (§ 47614, subd. (b); regs. 11969.3, 11969.9.)

### C. *Site Size*

Bullis contends that the District's analysis was flawed because it failed to consider the overall site size for the charter school as compared with the sizes of the comparable District-run schools. It argues that the Egan site is one-half the size of the schools in the comparison group and that the "site size by itself shows that Bullis has not received 'reasonably equivalent' facilities. [Citation.]" (Fn. omitted.)

The District acknowledged in the Facilities Offer that site size of the comparison group schools was a factor to consider under the regulations in making its reasonable equivalence analysis. A chart presented as an attachment to the Offer listed the relative acreage of the Egan site and of the five schools in the comparison group. Almond, Gardner, and Loyola were listed as 10 acres, Santa Rita was listed as 11.3 acres, and Covington was listed as "10+" acres. The District listed the Egan site as 6.2 acres. The Facilities Offer did not otherwise include an analysis of the relative site sizes of the schools. This was contrary to the approach the District had previously taken: The District, in each of the facilities offers to Bullis for the 2004–2005 through the 2007–2008 school years, included a calculation of "acres needed" for the charter school by determining the average acres per student for the comparison group schools considered.[19]

Bullis presented evidence that the actual site size of Covington was 13.64 acres. Using the average acreage and the average number of students at the five comparison group schools—the methodology used by the District in earlier facilities offers—Bullis showed that the Egan site offered to Bullis was over two acres smaller than a site that would be reasonably equivalent to the comparison group schools—and was thus only about three-quarters of the acreage that would be reasonably equivalent to the schools in the comparison group.[20] This is summarized in the following table:

---

[19] Kenyon testified that the District did not include a site size calculation in the 2009–2010 Facilities Offer because "[i]t did not seem to be a very relevant piece of information, and with five comparison schools instead of three, it took up too much space."

[20] Bullis claims that there was an even greater disparity, arguing that the actual acreage for the Egan site, after prorating the shared soccer field (see pt. IV.E., *post*), is 5.67 acres, and that therefore the Egan site was 2.7 acres (or 32 percent) smaller than a site that would be reasonably equivalent to the comparison group schools.

### Table 3—School Site Size—Five Comparison Group Schools

| School | Acreage | Students |
|---|---|---|
| Almond | 10 | 524 |
| Loyola | 10 | 538 |
| Covington | 13.64* | 459 |
| Gardner | 10 | 239 |
| Santa Rita | 11.3 | 506 |
| | | |

Average Acreage: 10.99

Acres Per Student: 0.0243

* District reported "10+" acres in 2009–2010 Facilities Offer.

Using these figures, and prorating the site based upon Bullis's projected 345 students, the appropriate size of the charter school site would have been 8.37 acres; the Egan site, according to the District, was only 6.2 acres. Confirming the obvious, the District's architect testified that the site sizes of the five comparison schools were substantially larger than the Egan site.[21]

Bullis argues that the District failed to comply with Proposition 39 because it "gave Bullis only *half* the acreage provided to the five comparison schools." It contends that "site size by itself shows that Bullis has not received 'reasonably equivalent facilities.' [Citation.]" (Fn. omitted.) We agree with Bullis to a certain extent.

■ The regulations require that the District, in conducting its reasonable equivalence analysis, "shall" use as a factor "[s]chool site size." (Reg. 11969.3, subd. (c)(1)(A).) Although the District listed the acreage of the comparison group schools and the Egan site in the Facilities Offer, it did not—contrary to its practice in earlier years—otherwise perform a site size analysis. The District's failure to conduct such a study is underscored by its failure to list the acreage of Covington, instead using a figure of "10+" acres.

---

[21] Bullis submitted evidence that had the District continued to follow its methodology of calculating the acres needed for the charter school site in its facilities offer for the 2008–2009 school year, it would have determined that the acres needed for Bullis would have been 8.46, acreage significantly greater than the District provided at the Egan site.

The District argues that because " 'school site size' is listed under 'Condition,' and not 'Capacity,' 'school site size' is a qualitative, not a quantitative, requirement. As such, it is incapable of being enforced through [mandamus]." We disagree. Regardless of where it is mentioned in the regulation, it is plainly a requirement that the District consider site size in its Proposition 39 analysis. Further, while a district's failure to consider site size in responding to a facilities request, in some instances, may not warrant the granting of any relief to a charter school, where an unconsidered site size disparity between the comparison group schools and the facilities offered to the charter school is significant, mandamus to compel the district to follow the law may be appropriate.

The Egan site is significantly smaller than any of the five comparison group school sites. When the acres-per-student formula is considered, the Egan site is still only 74 percent (6.2 acres divided by 8.37 acres) of the size that would be considered comparable. We disagree with Bullis's contention that "site size by itself shows that [it] has not received 'reasonably equivalent' facilities. [Citation.]" (Fn. omitted.) The fact that a charter school receives a smaller facility than those of the comparison group schools does not, by itself, warrant a finding that the charter school has not been provided reasonably equivalent facilities. Other factors, such as the overall relative condition of the facilities, size and number of buildings, etc., may result in the conclusion that the charter school was offered reasonably equivalent facilities, for example, because the site size discrepancy was neutralized by the charter school's being offered facilities qualitatively superior to those of the comparison group schools.

Here, however, the District's noncompliance with its Proposition 39 obligations involves more than merely its failure to consider site size. As we will conclude in part IV.H., *post*, the problems with the District's reasonable equivalence analysis in their totality warrant a finding that it failed to comply with the law.

### D. *Selection of Comparison Group Schools*

Bullis claims that the District used an improper method to select the schools in the comparison group, resulting in a reasonable equivalence analysis skewed in favor of the District-run schools.

1. *Evidence*

A District policy approved in 2004 called for the District, in determining reasonably equivalent conditions to be furnished to a charter school, to (among other things) select a comparison group of schools "comprised of the three schools in the school district with similar grade levels that the largest number of students of the charter school would otherwise attend." Kenyon testified that this policy had "not been amended or changed since September 7, 2004." In each of its facilities offers to Bullis for the 2004–2005 through the 2007–2008 school years, the District used the same three elementary schools as comparison group schools: Almond, Covington, and Santa Rita. For the 2008–2009 school year, as well as for the 2009–2010 school year at issue in this appeal, the District used five comparison group schools instead of three.[22]

The Gardner school was newly opened in the fall of 2008. Of the five schools in the comparison group used by the District in the 2009–2010 Facilities Offer, Gardner had the smallest number of students. The highest number of projected Bullis students would have otherwise attended Gardner, followed by Loyola, and Covington. Accordingly, had the District, in its 2009–2010 Facilities Offer, followed its policy and prior practice of selecting three comparison group schools, the calculation of the school site size needed by Bullis would have been 9.39 acres, as demonstrated by the following table:

**Table 4—School Site Size—Three Comparison Group Schools**

| School | Acreage | Students |
|---|---|---|
| Loyola | 10 | 538 |
| Covington | 13.64* | 459 |
| Gardner | 10 | 239 |
| | | |

Average Acreage: 11.21

Acres Per Student: 0.0272

\* District reported "10+" acres in 2009–2010 Facilities Offer.

---

[22] Kenyon in his deposition gave no reason for this change other than the advice of counsel.

Thus, had the District selected three schools for the comparison group, the acreage needed calculation would have shown a significantly larger site size needed by Bullis (9.39 acres) than under the five-school approach used in the Facilities Offer (8.37 acres; see table 3, *ante*).

## 2. *Discussion*

Bullis contends that the District intentionally changed its method of selecting the comparison group schools in violation of its own policy and in violation of the regulations in order to minimize the discrepancy between the site size required for Bullis and the size of the Egan site offered. The District responds that its selection of five comparison group schools in its analysis was not " 'arbitrary, capricious, lacking in evidentiary support, or was made without due regard for petitioner's rights.' [Citation.]" The Facilities Offer includes a recital that the District's selection of five comparison schools was done in an effort "to obtain the broadest scope of comparative information for purposes of identifying and providing [Bullis] with a reasonably equivalent site . . . ." And the District claims that its selection of Loyola as one of the comparison group schools was a rational one in light of "the fact that it was the second-highest school in terms of the attendance area of the students attending [Bullis]."

■ Regulation 11969.3 contains two subdivisions describing (apparently alternative) methods by which a school district must select the comparison group schools in performing the Proposition 39 analysis. Regulation 11969.3, subdivision (a)(2) reads in relevant part: "The comparison group shall be the school district-operated schools with similar grade levels that serve students living in the high school attendance area, as defined in Education Code section 17070.15(b), in which the largest number of students of the charter school reside. . . ." Subdivision (a)(3) reads in relevant part: "For school districts whose students do not attend high school based on attendance areas, the comparison group shall be three schools in the school district with similar grade levels that the largest number of students of the charter school would otherwise attend. . . ."

Here, it is uncontested (as stated in the Facilities Offer) that the "[s]tudents attending Loyola live within a different high school attendance area—Mountain View High School—than those attending Gardner, Covington,

Almond and Santa Rita." Therefore, Bullis argues, selecting Loyola for the comparison group was contrary to subdivision (a)(3) of regulation 11969.3. But the use of five schools rather than three, Bullis argues further, was contrary to the District's policy and past practice.

Although the language of the regulation does not leave us free from doubt, we read regulation 11969.3 as requiring a school district to select the comparison group by (1) determining the high school attendance area in which the highest number of charter school students reside, and (2) then selecting *all* "district-operated schools with similar grade levels" as the charter school as the comparison group. (Reg. 11969.3, subd. (a)(2).) Alternatively, if the school district is not based upon a system in which students attend "high school based on attendance areas," the district must select as the comparison group the three district-run schools "with similar grade levels that the largest number of students of the charter school would otherwise attend." (Reg. 11969.3, subd. (a)(3).)

Here, at least from this record, the system was not one in which the District's students attended high school based upon something other than attendance areas; the alternative method of regulation 11969.3, subdivision (a)(3) does not appear to apply. Thus, the fact that the District did not follow its procedure and past practice of selecting three schools for the comparison group is of no consequence.[23] And since Loyola's students live in a different attendance area, it does not appear that Loyola should have been included in the comparison group. But the record is unclear whether there were schools besides Gardner, Covington, Almond, and Santa Rita with grade levels similar to Bullis's and which served students in the high school attendance area in which the largest number of Bullis students reside. Assuming there were no other schools, had the District used only Gardner, Covington, Almond, and Santa Rita for the comparison group, the "acres needed" figure for Bullis would have been 8.98 acres, a figure only slightly higher than the figure based upon the five comparison schools the District selected.

---

[23] It would appear, from our interpretation of the regulation, that the District's procedure (which it did not comply with here) did not follow regulation 11969.3. Although the policy contained language nearly identical to a portion of regulation 11969.3, subdivision (a)(3) (". . . which comparison group shall be comprised of the three schools in the school district with similar grade levels that the largest number of students of the charter school would otherwise attend. . . ."), it failed to include the qualifying first clause of the regulation: "For school districts whose students do not attend high school based on attendance areas . . . ." (*Ibid.*)

We perceive the principal error in the District's approach, as discussed in part IV.C., *ante*, to have been its failure to consider site size at all in the Proposition 39 analysis. In light of the ambiguity of the regulation—and the District's recital that its selection of a five-school comparison group (including Loyola, a school that the second highest number of Bullis students would have otherwise attended) was done to provide "the broadest scope of comparative information"—we do not find from this record that the District's comparison group selection method here was in violation of Proposition 39.

### E. *Measurement of Bullis's Site*

Bullis argues that the District used incorrect figures with respect to certain space at the Egan site in that it (a) used incorrect measurements of certain portions of the Egan site; (b) failed to account for the fact that Bullis had only forty percent access to a soccer field; and (c) "counted" a room as being a District-provided facility which was built, owned, and maintained by Bullis. As a result, Bullis contends that the Facilities Offer contained overstatements of the site it offered to Bullis.

#### 1. *Evidence*

As noted above, the District in its Facilities Offer calculated the amount of certain portions of outdoor space—K play area, non-K blacktop, and turf area—that should be supplied to Bullis based upon the average amounts of such space available to students at the five comparison group schools. Irrespective of whether the District's methodology was in error—in that it failed to account for all nonteaching station space—the evidence was that the blacktop and turf areas at the Egan site were significantly smaller than as stated by the District.

The Facilities Offer listed the blacktop area at the Egan site as 53,430 square feet. Although the District revised that figure downward by about 4,000 square feet in its opposition to the Petition, its architect, Schadt, testified that the correct figure was actually 40,010, or more than 13,000 square feet smaller than the figure in the Facilities Offer. He explained that he had prepared a corrected drawing indicating that the blacktop area was 41,930 square feet, and that this figure included 1,920 square feet of blacktop upon which two portable buildings were located.

The turf area at the Egan site was listed in the Facilities Offer as 87,310 square feet. Although the District's opposition below noted that this figure was understated by about 4,000 square feet, Schadt concluded that the turf

area was 82,470 square feet. This figure included a children's playground—an area not included in the comparison group schools. After deduction of this area, the total turf area was 80,470.[24]

A portion of the turf area at the Egan site is a grass soccer field which Schadt in his corrected drawing indicated was 29,230 square feet. There is a fence separating Bullis from this field, although there is no fence separating the soccer field from Egan Junior High School. Bullis and the junior high school share the soccer field during school hours; Bullis may use the field two days a week while Egan Junior High School uses it three days a week. No other District elementary school is required to share turf with another school during school hours. Because it does not have unrestricted use of the soccer field during school hours, Bullis contends that it was inappropriate for the District to have included 100 percent of the field in its calculation of the amount of turf area provided in the Facilities Offer. Bullis argues that only a pro rata share of the field should have been included, based upon its restricted use of the soccer field to 40 percent of the time during school hours.[25]

Accepting, for the moment, Bullis's claim that the soccer field should not have been credited in full as a facility offered by the District, as seen from the table below, there is a significant disparity between the size of the blacktop and turf actually offered to Bullis as compared with sizes presented in the District's Facilities Offer:

### Table 5—Bullis Outdoor Measurements (square foot)

| | Fac. Offer (4/1/09) | Dist. Corr. Drawing (10/9/09) | Dist Architect. Corr. (10/13/09) | Dist. Architect Corr. 2d (10/13/09) | Proration (40%) for soccer field (29,230) | Avg. Space for 5 Comp. Schools (4/1/09) | % of Comp. School avg. |
|---|---|---|---|---|---|---|---|
| **Blacktop** | 53,430 | 49,330 | 41,930 | 40,010 | | 56,164 | 71% |
| **Turf** | 87,310 | 91,410 | 82,470 | 80,470 | 62,470 | 109,323 | 57% |

[24] There was evidence that Schadt knew that the District's figures for the Egan site's blacktop and turf were overstated, and that he had so advised the District and its counsel before the District filed its opposition containing the erroneous figures. The record does not present an explanation from the District as to its reason for filing the opposition with the overstated figures.

[25] Bullis also argues that as to the two days per week in which it has unrestricted access to the soccer field during school hours, its use is diminished because its school day is slightly longer than the school day of Egan Junior High School. We have considered this claim and conclude that the consequences of the school hour difference between the two schools is de minimis. We view the principal problem to be the District's treatment of the soccer field as space to which Bullis had unrestricted access, notwithstanding the reality that it was shared space to which Bullis had access only 40 percent of the time during school hours.

The Offer includes in its description of the facilities offered a multipurpose room of 4,330 square feet. The evidence is undisputed that this room was built in 2007, pursuant to the agreement of the parties, at Bullis's sole expense. Kenyon testified that the room was included in the Facilities Offer because the District was responsible for its maintenance and utilities, including water and sewer costs. Bullis offered evidence refuting the District's claim that it was responsible for maintaining the multipurpose room, including the presentation of facilities use agreements for the 2007–2008 and 2008–2009 school years indicating Bullis's maintenance responsibility for the room.[26]

## 2. *Discussion*

 Regulation 11969.3, subdivision (b)(3) requires that a school district "allocate and/or provide" to in-district charter school students a level of nonteaching station space that is based upon the "in-district classroom ADA of the charter school and the per-student amount of nonteaching station space in the comparison group school." And regulation 11969.9, subdivision (h) compels a school district, in its final facilities offer, to identify, inter alia, the nonteaching station space offered to the charter school on both an exclusive and a shared basis. The non-K blacktop and turf areas identified by the District in its Facilities Offer represent a portion of that nonteaching station space. Hence, any material overstatement of the amount of that space offered and provided to Bullis constitutes a violation of Proposition 39 and its implementing regulations.[27]

Here, the blacktop area was overstated in the Facilities Offer by over 13,000 square feet, or about one-third of its actual square footage. The turf area—without regard to Bullis's claim that the soccer field should have been prorated—was overstated by over 7,000 square feet, or about 8.5 percent of its actual square footage.

In performing its Proposition 39 analysis, the District included the 29,230-square-foot soccer field as if it were offered to Bullis without restriction on its

---

[26] Bullis also pointed out that, contrary to Kenyon's assertion that the District was responsible for the utilities, including plumbing, the multipurpose room has no plumbing.

[27] This discussion addresses the District's overstatement of areas representing only a *portion* of nonteaching station space. No implication may be drawn from our discussion of this issue that we approve of the District's approach of selecting only part of the nonteaching station space of the comparison group schools in determining the appropriate level of facilities to provide to Bullis. As we have discussed in part IV.B., *ante*, the District's approach was in violation of Proposition 39 and its implementing regulations.

use. The unrebutted evidence, however, was that Bullis could only use the field during school hours on two out of five school days, and that none of the comparison group schools was required to share turf areas. The District's failure to acknowledge and account for Bullis's shared use of the soccer field had the effect of distorting the analysis. Moreover, the District ignores the fact that, under the regulations, a district may not charge a charter school for shared space on a 100 percent basis; rather, it may charge only a pro rata portion of the shared space. (Reg. 11969.7, subd. (c).) The District's methodology of ignoring space-sharing arrangements offered to Bullis in performing the reasonable equivalence analysis is the antithesis of a school district's Proposition 39 obligation "to give the same degree of consideration to the needs of charter school students as it does to the students in district-run schools." (*Ridgecrest, supra*, 130 Cal.App.4th at p. 999, fn. omitted.) We thus conclude that the District should have allocated only 40 percent of the soccer field in calculating the amount of turf area provided to Bullis. As noted above, such an allocation would mean that the Facilities Offer overstated the amount of turf area provided to Bullis by nearly 25,000 square feet, or 40 percent of its actual square footage.

Lastly, a school district's Proposition 39 obligation is to provide *its* facilities to charter schools in a manner that will promote the intent of "public school facilities [being] shared fairly among all public school pupils, including those in charter schools." (§ 47614, subd. (a).) Those facilities provided by the district "shall remain the property of the school district." (§ 47614, subd. (b); see also reg. 11969.4, subd (a) ["Facilities . . . provided to a charter school by a school district shall remain the property of the school district."].) Moreover, since "[s]ection 47614 clearly contemplates that multiple districts may have an obligation to provide facilities to a charter school" (*Sequoia, supra*, 112 Cal.App.4th at p. 193), just as it would be inappropriate under such circumstances for one district to count facilities provided by another district as partially satisfying the former district's Proposition 39 obligation, it is likewise inappropriate for a district to count charter-school-owned facilities. Therefore, we agree with Bullis that a school district may not include nondistrict facilities in its Proposition 39 analysis. Although the District noted in the Facilities Offer that the multipurpose room was built at Bullis's expense, it appears to include this room in its analysis as if it were a District-provided facility.[28]

---

[28] We observe that since a Proposition 39 facilities offer considers only district-owned facilities that a school district may be required to provide to a charter school, there may theoretically be an instance—for example where substantial facilities are built and paid for by the charter school itself—where the charter school has facilities superior to those of its district-run counterparts. Neither the statute nor the implementing regulations address the possibility of such a windfall to a charter school, nor are we called upon to address the issue in this case.

### F. Standard Room Sizes

Bullis contends that the District used a methodology in its Facilities Offer for determining the size of particular rooms, namely the library and multipurpose room, which resulted in a distortion of the reasonable equivalence analysis.

In each of its facilities offers for the 2004–2005 through the 2007–2008 school years, the District's analysis included figures that represented the average room sizes of certain facilities, such as the library and multipurpose room, of the comparison group schools. Commencing with the offer for the 2008–2009 school year, and continuing with the 2009–2010 Facilities Offer, the District used a different approach. Although the District labeled the figures as "AVERAGE[S] of 5 schools," they represented what the District's assistant supervisor later termed "standard" room sizes; they were not the average room sizes of the five schools in the comparison group.[29] For instance, the District in its Facilities Offer used a figure of 1,920 square feet as the standard library room size. This is a marked reduction from the actual average library size (3,130 square feet) of the comparison group schools (Almond, Covington, and Santa Rita) used in four of the District's prior facilities offers. And Kenyon admitted that none of the libraries of the five comparison group schools was smaller than 1,920 square feet. Despite the fact that the actual average library size of the comparison group schools was apparently significantly more than 1,920 square feet,[30] the District used that figure, multiplied by a 72 percent ratio,[31] to arrive at a library size of 1,389 feet, which it claimed satisfied the reasonable equivalence mandate. According to the Facilities Offer, the library it supplied to Bullis was 1,440 square feet.

 This procedure is inconsistent with the mandate of Proposition 39 that public school facilities "be shared fairly" among all public school students, including those enrolled in charter schools. (§ 47614, subd. (a).) A facility such as a library, apparently considered by the District to be specialized classroom space,[32] must be provided by the school district to the charter school if the "district includes specialized classroom space." (Reg. 11969.3, subd. (b)(2).) As is true with classroom space and nonteaching station space, the regulations require that the school district offer and provide specialized

---

[29] Kenyon testified that "that average of five schools is a bit misleading."

[30] Although (according to the District's earlier facilities offers) the average size of the libraries at Almond, Covington, and Santa Rita was 3,130 square feet, the record does not reflect the average library size of all five comparison group schools.

[31] This ratio was applied to account for a smaller number of in-district Bullis students than the average number of students at the comparison group schools.

[32] The Facilities Offer classifies the library as "Specialized Instructional Space," and lists separately facilities offered to Bullis that it considers "Non-Teaching Space."

classroom space to charter schools consistently with the reasonable equivalence standard of Proposition 39. (Regs. 11969.3, subd. (b)(2), 11969.9, subd. (h)(1).) In order to perform a proper reasonable equivalence analysis, the school district must determine and utilize the applicable figures for the specialized classroom space considered by referring to the comparison group schools and relating those figures to the space offered to the charter school. The District's approach of assigning arbitrary "standard" room size figures to particular specialized classroom space is improper. In this instance, rather than reflecting an average size of a library facility at the five comparison group schools, the "standard" constituted the size of the smallest library of the group. While, as is the case with charter school enrollment projections, "arithmetical precision" (*Sequoia, supra,* 112 Cal.App.4th at p. 196) is not required in a school district's Proposition 39 analysis to determine appropriate facilities to offer and provide to a charter school, a good faith effort to achieve reasonable equivalence is necessary. The use of "standard" sizes by the District here fails that standard.

## G. *Failure to Provide Childcare Facility*

Bullis contends that the Facilities Offer was also deficient because it failed to include a before- and after-school childcare facility. It argues that it had requested such a facility, but the District refused the request.

Although each of the five schools in the comparison group has a childcare facility, the Facilities Offer did not provide one to Bullis. Nor were childcare facilities listed in the District's reasonable equivalence table made part of the Facilities Offer, which table included an identification and description of various classrooms, other rooms, and portions of the grounds of the comparison group schools. Although specifically requested by Bullis in two communications preceding the Facilities Offer, the District noted in the offer that such a facility "fall[s] outside of those contemplated by the regulation . . . ." Further, Kenyon testified that the District did not offer a childcare facility because it was not required to do so, Bullis had not requested one, and it was "never been an issue that [Bullis] brought up."[33]

---

[33] Bullis also mentions in passing that although each of the five comparison group schools had an outdoor amphitheatre, such a facility was not addressed or provided in the Facilities Offer. As we have discussed (see pt. IV.B., *ante*), to the extent that such a facility was part of the "non-teaching station space" available at any or all of the comparison group schools, it should have been included in the Facilities Offer in order for the District to present a fair analysis of the facilities required to satisfy the reasonable equivalence mandate of Proposition 39.

As we have noted, a school district is required under Proposition 39 and the implementing regulations to offer and provide facilities, including non-teaching station space, to charter schools in a manner that is consistent with the objective of public school facilities being "shared fairly" among all public school students, including charter school students. (§ 47614, subd. (a).) The District did not meet this obligation. By failing to identify and consider such nonclassroom space as a childcare facility in the Facilities Offer, the District did not give an accurate report of the comparison group schools' facilities.[34]

## H. *Conclusion*

The Facilities Offer to Bullis for the 2009–2010 school year did not satisfy the District's obligations under Proposition 39. The District did not consider all "non-teaching station space" at the five comparison group schools to determine the amount of such space that would be appropriate to provide to Bullis. Instead, the District considered only a discrete portion of that space (K play, non-K blacktop, and turf areas) in the Facilities offer. It compounded this error by significantly understating this space for the comparison group schools. Indeed, the amount of unreported "non-teaching station space" at the five comparison group schools was *over one million square feet*. The District also significantly overstated the blacktop and turf areas at the Egan site offered to Bullis. These deficiencies caused the amount of space to be supplied to Bullis as provided in the analysis to be greatly understated. These deficiencies—as well as the District's failure to consider in its analysis a before- and after-school childcare facility, when such a facility was provided to each of the comparison group schools—violated the reasonable equivalence requirements of section 47614, subdivision (b) and regulation 11969.3, subdivision (b)(3).

In addition, the District's use of "standard" sizes of certain rooms of specialized classroom space, such as a library, to understate considerably the appropriate size of such rooms for Bullis violated regulation 11969.3, subdivision (b)(2). Moreover, the failure of the District to consider the overall

---

[34] This obligation to account for all space at the comparison group schools does not imply that a district necessarily must offer and supply to a charter school each kind of facility (such as childcare and outdoor amphitheatre facilities) existing at any comparison group school. We perceive that Bullis does not so contend. And in oral argument, its counsel indicated that a charter school need not receive the same facilities that its comparison group schools have, so long as all of the facilities of the comparison group schools are considered in the Proposition 39 analysis.

site size of the comparison group schools in determining the appropriate site size Bullis's in-District students should receive under Proposition 39 violated regulation 11969.3, subdivision (c)(1)(A). This consideration was of some importance here, as demonstrated by the fact that had site size been considered by the District, the Egan site would have been determined to be only about 75 percent of the acreage appropriate for Bullis's in-District students (or only 68 percent if the soccer field were prorated based upon its shared use).

■■■ Under Proposition 39 and the implementing regulations, a school district must allocate in its facilities offer, and provide to in-district charter school students, facilities with "conditions reasonably equivalent to those in which the [charter school] students would be accommodated if they were attending other public schools of the district." (§ 47614, subd. (b).) The District did not meet this obligation. The District provided an incomplete and inaccurate report of both the comparison group schools' facilities and the Egan site itself. The deficiencies in the Facilities Offer caused a significant distortion of the Proposition 39 analysis with the result that Bullis's in-District students were not afforded reasonable equivalence, particularly with respect to nonteaching station space.[35]

While a Proposition 39 analysis does not necessarily compel a school district to allocate and provide to a charter school each and every particular room or other facility available to the comparison group schools, it must at least account for the comparison schools' facilities in its proposal. A determination of reasonable equivalence can be made only if facilities made available to the students attending the comparison schools are listed and considered. And while mathematical exactitude is not required (cf. *Sequoia, supra,* 112 Cal.App.4th at p. 196 [charter school need not provide enrollment projections with "arithmetical precision"]), a Proposition 39 facilities offer must present a good faith attempt to identify and quantify the facilities available to the schools in the comparison group—and in particular the three categories of

---

[35] It was suggested by Bullis's counsel at oral argument that the District's Facilities Offer was made in bad faith and without regard to its obligations under Proposition 39. There is certainly evidence in the record—e.g., failure to consider large amounts of comparison group school space, disregarding site size component, and changing established methods of performing the reasonable equivalence analysis—from which such a finding could be made. We decline to do so here. Although a school district, in responding to a charter school's facilities request, must make a good faith effort to perform a reasonable equivalence analysis that is consistent with section 47614 and the implementing regulations, we do not find that a breach of such an obligation that may warrant mandamus relief to a charter school must be in bad faith.

facilities specified in regulation 11969.3, subdivision (b) (i.e., teaching stations, specialized classroom space, and nonteaching station space)—in order to determine the "reasonably equivalent" facilities that must be offered and provided to a charter school.

■ Although "giv[ing] the same degree of consideration to the needs of charter school students as . . . to the students in district-run schools" (*Ridgecrest, supra,* 130 Cal.App.4th at p. 999, fn. omitted) may appear a subjective or elastic concept, the implementing regulations govern the manner in which a school district must give that same degree of consideration to charter school students in formulating a Proposition 39 facilities offer. The school district unquestionably has a statutory duty to offer and provide reasonably equivalent facilities to in-district charter school students consistently with Proposition 39 and the regulations. Stated conversely, a school district does not have the discretion to employ practices that are contrary to the very intent of Proposition 39 that school district facilities be "shared fairly among all public school pupils, including those in charter schools" (§ 47614, subd. (a)).

■ Mandamus is appropriate where the public entity has failed to perform its ministerial duty (*Santa Clara County Counsel Attys. Assn. v. Woodside, supra,* 7 Cal.4th at pp. 539–540)—here, of offering and providing reasonably equivalent facilities under Proposition 39—and has acted "without due regard for the petitioner's rights" (*Sequoia, supra,* 112 Cal.App.4th at p. 195). In an analogous case, *Ridgecrest, supra,* 130 Cal.App.4th 986, the appellate court found mandamus to be appropriate where the school district had provided a charter school with classrooms at five different locations in breach of the district's Proposition 39 obligation to provide the charter school with facilities that are "contiguous" (§ 47614, subd. (b)). Likewise, here, mandamus is appropriate because the District did not satisfy its obligation of presenting a complete and fair facilities offer to Bullis from which it could be determined that "reasonably equivalent" facilities were provided. The court therefore should have granted mandamus and declaratory relief finding that the District's Facilities Offer for the 2009–2010 School Year did not comply with Proposition 39 and the implementing regulations.[36]

---

[36] The court below, in otherwise denying relief to Bullis, made a finding that the Facilities Offer "was inadequate on the issue of outdoor non-teaching facilities." As we have found, the Facilities Offer was deficient in a number of respects; these deficiencies, in their totality, lead us to conclude that the Offer did not comply with Proposition 39 and that mandamus relief was therefore proper.

## DISPOSITION

The judgment is reversed.

Rushing, P. J., and Grover, J.,* concurred.

A petition for a rehearing was denied November 21, 2011, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied January 18, 2012, S198465.

---

*Judge of the Monterey Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.