[No. B226499. Second Dist., Div. Eight. Jan. 25, 2012.]

BUILDING A BETTER REDONDO, INC., et al., Plaintiffs and Respondents, v.
CITY OF REDONDO BEACH et al., Defendants and Appellants.

**COUNSEL**

The Sohagi Law Group, Margaret M. Sohagi, Philip A. Seymour, R. Tyson Sohagi; Meyers, Nave, Riback, Silver & Wilson, Deborah J. Fox, Margaret W. Rosequist; Michael W. Webb, City Attorney, and Cheryl Park, Assistant City Attorney, for Defendants and Appellants.

Angel Law, Frank P. Angel and Jeff El-Hajj for Plaintiffs and Respondents.

**OPINION**

**FLIER, J.**—Respondents Building a Better Redondo, Inc., and James A. Light (BBR) brought a petition for writ of mandate and a declaratory relief claim against appellants City of Redondo Beach, its city council and its city clerk (collectively, City or appellants). BBR sought an order compelling appellants to submit a local coastal program amendment to public vote in compliance with a recently enacted charter amendment requiring any "major change in allowable land use" to be approved by City voters. Appellants argued that the local coastal program amendment predated the charter amendment and thus was not governed by it. The trial court found the local coastal program amendment constituted a major change in allowable land use and ordered appellants to place the amendment before the voters. Although appellants appealed the judgment, they also voluntarily complied with the court's writ of mandate. The court subsequently awarded BBR its attorney fees. Appellants appeal the judgment and attorney fees order. We hold the appeal from the judgment should be dismissed as moot and affirm the award of attorney fees.

## GENERAL BACKGROUND AND FACTS

### 1. *Coastal Act*

The Legislature enacted the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.; Coastal Act)[1] as a comprehensive scheme governing land use planning for the entire California coastal zone. (*Yost v. Thomas* (1984) 36 Cal.3d 561, 565 [205 Cal.Rptr. 801, 685 P.2d 1152].) The Coastal Act requires cities and counties in the coastal zone to prepare and adopt a local coastal program to implement coastal development and preservation policies found in chapter 3 of the Coastal Act. (*Yost, supra,* at pp. 565–566; §§ 30200–30265.5, 30500–30519.) The local coastal program consists of (1) a land use plan and (2) zoning ordinances, zoning district maps and, if needed, other implementing measures. (*Yost, supra,* at p. 566; §§ 30511–30513.) Although local governments may amend any portion of their land use plans, "no such amendment shall take effect until it has been certified by the commission." (§ 30514, subd. (a).)

### 2. *Coastal Land Use Plan*

In 1981, the City approved, and the California Coastal Commission (Coastal Commission) certified, a coastal land use plan for Redondo Beach. The Redondo Beach coastal land use plan generally designated the area encompassing King Harbor and Redondo Beach Pier (Harbor/Pier area) for commercial uses, imposing no quantitative restrictions or standards of development.

In 2002, the city council approved a coastal zone ordinance intended to be part of the local coastal program. It concurrently approved a plan called "Heart of the City," for the Harbor/Pier area and adjoining territory, comprising a combination of coastal land use plan, zoning ordinance, general plan and specific plan amendments. This plan would have allowed intensive commercial and condominium development for the Heart of the City. The proposed development was unacceptable to many City voters, who filed referendum petitions on the Heart of the City specific plan and related general plan amendments. In response to the petitions, the city council repealed the Heart of the City plan in June 2002 and reinstated a prior Harbor/Civic Center specific plan for the area.

The city council decided not to submit the Heart of the City zoning and coastal land use plan amendments to the Coastal Commission for certification. Instead, the city council submitted to the Coastal Commission portions

---

[1] All further statutory references are to the Public Resources Code unless otherwise indicated.

of a new coastal zoning ordinance covering only the predominantly residential portions of the City's coastal zone (Area 1). In April 2003, after approving the geographical segmentation of the City into two areas (Area 1 and Area 2) for Coastal Act purposes,[2] the Coastal Commission certified the coastal zoning ordinance for Area 1, subject to the City's agreement to a number of modifications. (See § 30511, subd. (c).)

### 3. *2005 Ordinances*

On August 2, 2005, the city council passed resolutions and ordinances (2005 ordinances) amending the coastal zoning ordinance, coastal land use plan, general plan and Harbor/Civic Center specific plan for Area 2. The 2005 ordinances provided: "This ordinance . . . shall go into effect and be in full force and operation from and after thirty (30) days after its final passage and adoption." A companion resolution, however, further provided that "[t]he City Council hereby certifies that the [local coastal program] as amended . . . is intended to be carried out in a manner that is fully in conformity with the Coastal Act, and the submittal of the [local coastal program] amendments to the Coastal Commission is consistent with Section 30510 . . . ." The resolution further declared that the proposed amendments "will take effect automatically upon Coastal Commission approval pursuant to . . . Sections 30512, 30513, and 30519 for [local coastal programs]."

### 4. *2008 Enactments*

On May 6, 2008, the city council approved a resolution and companion ordinance (2008 ordinance) amending the local coastal program for Area 2. The council eliminated earlier residential use designations in Area 2 and proposed five "coastal commercial" zones allowing for a net increase of 400,000 square feet in new development. The allowable uses in the coastal commercial zones were to include retail sales, restaurants, bars, nightclubs, offices, hotels and motels, as well as hybrids between motels and residential condominiums, referred to as "condominium-hotels," "fractional ownership hotels" and "timeshares."

The 2008 ordinance purported to decree two separate effective dates. Section 14 of the 2008 ordinance provided: "This ordinance . . . shall go into effect and be in full force and operation from and after thirty (30) days after its final passage and adoption. For purposes of approving Coastal Development Permits, this ordinance shall be effective on the date of certification by

---

[2] Area 2 included the Harbor/Pier area, AES Corporation power generating plant and Catalina Avenue corridor. In 2006, a portion of the Catalina Avenue corridor was transferred to Area 1. Neither Area 1 nor the 2006 transfer is at issue in this appeal. For purposes of discussion, Area 2 hereafter shall refer to the remaining portion of the Catalina Avenue corridor, Harbor/Pier area and AES power generating plant at issue.

the Coastal Commission." However, in the companion 2008 resolution the city council declared its 2008 coastal zoning and land use plan decisions were "proposed amendments" to its local coastal program that would "take effect automatically upon Coastal Commission approval pursuant to . . . Sections 30512, 30513, and 30519 for [local coastal programs]."

### 5. *Measure DD*

About this time, BBR and other advocates of a slow-growth or no growth philosophy began circulating an initiative petition (Measure DD) to place on the ballot a proposed amendment to the city charter. A notice of intention to circulate Measure DD was published in July 2007 and circulated among voters for signature. Proponents of the initiative petition obtained sufficient signatures to qualify the petition for submission to the voters at an election. In March 2008, the city council ordered the initiative measure to be placed on the ballot for the November 4, 2008 General Election. The question put to the voters was: "Shall an Initiative to amend the Redondo Beach City Charter by adding Article XXVII to require voter approval of specified changes in allowable land use be adopted?"[3]

At the General Election of November 4, 2008, Measure DD passed, adding article XXVII to the city charter.[4] On December 16, 2008, the charter amendment was accepted and. filed by the California Secretary of State. Article XXVII thus took effect on December 16, 2008. (Cal. Const., art. XI, § 3, subd. (a).)

In passing Measure DD, the voters of Redondo Beach found, among other things, that "[t]he City's traffic circulation system is already oversaturated, and at or near gridlock during rush hours, and, as such, is inadequate to support the City's existing level of development" and that "[t]hese existing traffic and traffic circulation system conditions, and their adverse public safety, public health and quality of life consequences, bear testimony to the fact that the City's existing land use and development review and approval procedures do not carefully or accurately consider, nor adequately weigh, the adverse impacts to the local environment and quality of life caused by increased density and congestion resulting from major changes in allowable land use." (Redondo Beach City Charter, art. XXVII, § 27, subds. (b) & (c).) Redondo Beach City Charter (Charter), article XXVII, section 27.4, subdivision (a) provides: "Each major change in allowable land use shall be put to a vote of the People; provided, however, that no such change shall be submitted

---

[3] The council also ordered that the text of the proposed charter amendment be submitted to the voters, and that it be reprinted in full in the sample ballot.

[4] Measure DD passed with 58.55 percent of the vote, 17,412 voting for the measure and 12,241 against.

to the voters unless the City Council has first approved it. A major change in allowable land use shall become effective only after approval by the City Council and a majority of the voters of the City voting 'YES' on a ballot measure proposing such change at either a regular or special municipal election." Charter, article XXVII, section 27.2 defines a " 'Major Change in Allowable Land Use' " as "any proposed amendment," among other things, to the coastal zoning ordinance meeting any one or more of three listed conditions, including defined significant increases in traffic, density or intensity of use above specified physical baseline conditions. (Charter, art. XXVII, § 27.2, subd. (f)(1)–(3).)[5]

### 6.  *Submittal to Coastal Commission*

On May 19, 2008, the City submitted the 2005 and the 2008 local coastal program amendment resolutions and related ordinances to the Coastal Commission for certification under the Coastal Act.

On July 9, 2009, a public hearing took place before the Coastal Commission on the City's local coastal program amendment submittal. Based on detailed findings, the commission denied certification of the amendment proposed under the City's 2005 and 2008 land use plan amendment resolutions and ordinances. The Coastal Commission suggested a number of modifications to the City's local coastal program amendment proposal. The suggested modifications directed the City to amend portions of the land use and implementation plans to address certain deficiencies, such as the protection of environmentally sensitive habitat areas and marine resources. The commission indicated that if the city council should accept and adopt the commission's suggested modifications, it would certify the amendment as modified. However, the City was notified that the amendment would not be deemed final and effective for implementation in the local coastal zone until

---

[5] No conditions are listed under Charter, article XXVII, section 27.2, subdivision (f), but paragraphs (1), (2) and (3) following Charter, article XXVII, section 27.2, subdivision (g) each refers to a "proposed change in allowable land use" whereas subdivision (g) defines "Peak Hour Trips" and has no references to any paragraphs. " 'In construing a provision adopted by the voters our task is to ascertain the intent of the voters. [Citation.] . . . Literal construction should not prevail if it is contrary to the voters' intent apparent in the provision. [Citation.] "An interpretation that renders related provisions nugatory must be avoided . . . , [and] each sentence must be read . . . in the light of the [charter's overall] scheme . . . ." [Citation.] Provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.]' " (*Arntz v. Superior Court* (2010) 187 Cal.App.4th 1082, 1091–1092 [114 Cal.Rptr.3d 561], quoting *International Federation of Professional & Technical Engineers v. City and County of San Francisco* (1999) 76 Cal.App.4th 213, 224–225 [90 Cal.Rptr.2d 186].) Charter, article XXVII, section 27.10 declares that "[t]his article shall be liberally construed to accomplish its purposes." From the context of the Charter provisions and giving meaning to each provision, we conclude paragraphs (1), (2) and (3) appearing under subdivision (g) should be construed as properly a part of subdivision (f).

certain conditions were satisfied. These conditions included the city council's acceptance by resolution of the Coastal Commission's suggested modifications, a determination by the executive director that the City has legally complied with the Coastal Commission's action and the commission's acceptance of that determination after a public hearing. (Cal. Code Regs., tit. 14, § 13544.)

### 7. *Modification of Amendment to Local Coastal Program*

On April 6 and April 20, 2010, the city council approved an amendment to the City's local coastal program for Area 2 incorporating the modifications suggested by the Coastal Commission, but it rejected putting the change to a vote as to the coastal zoning ordinance regulations and portions of the land use policies contained in them. The city council declared that only certain amendments to the Area 2 coastal land use plan adopted in May 2008 constituted or were integrally related to a major change in allowable land use within the meaning of Charter, article XXVII, section 27.2 and thus were subject to a public vote. The city council also deferred the election order to an unspecified future time when, by a "further resolution," the council would set an election. The city council rejected requests that the entire Area 2 coastal zoning ordinance amendment be placed on an election ballot.

## PROCEDURAL HISTORY

In face of the city council's refusal to place the entire Area 2 local coastal plan on a ballot, BBR filed a petition for writ of mandate and complaint for declaratory relief against appellants on May 20, 2010. BBR alleged it was formed to give City residents the right to vote on major commercial and residential zoning actions that would significantly increase traffic and traffic congestion in the City. BBR sought a writ of mandate to require appellants to submit the entire Area 2 local coastal program amendment, including the implementing coastal zoning ordinance amendment for Area 2, on the ballot for voter approval under Charter, article XXVII. In addition to the 2008 coastal land use plan amendments that the city council indicated would be submitted to the electorate, BBR contended City residents should have the right to vote on the 2008 coastal zoning ordinance amendment (which the City deemed to be already legally effective), the 2005 coastal zoning and coastal land use plan amendments, and the modifications to the coastal zoning ordinance and coastal land use plan approved by the city council in April 2010.

A hearing was held before retired Judge Robert O'Brien, who issued a written decision in favor of BBR on July 28, 2010. The court determined that Charter, article XXVII, section 27.2 defined a " 'Major Change in Allowable

Land Use' " as "any proposed amendment," among other things, to the zoning ordinance for the coastal zone, meeting any one or more of three listed conditions, including defined significant increases in traffic, density or intensity of use above specified physical baseline conditions. When such a major change takes the form of an amendment to the City's local coastal program, the court determined, voter approval is a supplement to, not substitute for, Coastal Commission review and certification.[6] The court found that the Area 2 coastal zoning ordinance amendment constituted a major change in allowable land use because the amendment allowed 400,000 square feet of additional floor area.

The trial court rejected the City's argument that the coastal zoning ordinance amendment was not subject to a popular vote because the amendment's "predecessor" ordinances took effect prior to December 16, 2008, the date Charter, article XXVII became effective. The court further disagreed with the City's position that the 2008 zoning ordinance and the 2005 zoning ordinance were effective 30 days after their adoption by the city council, i.e., September 1, 2005, for the 2005 zoning ordinance and June 5, 2008, for the 2008 zoning ordinance. The court found that because the 2005 and 2008 ordinances had not been certified by the Coastal Commission prior to December 16, 2008, they could not have taken effect prior to December 16, 2008, and so amounted to mere "contemplated legislation."

The trial court determined, moreover, that the Coastal Act, state administrative regulations and City zoning regulations prescribe "special procedures" for passing, approving and putting into effect local coastal programs. The Coastal Act established the Coastal Commission's "duty and authority" to certify local coastal programs to ensure that coastal land programs anywhere in the California coastal zone met the requirements of and conformed to the policies set forth in chapter 3 of the Coastal Act. (See § 30512, subd. (c).) The court indicated that section 30513 specifically provides that if the Coastal Commission rejects a coastal zoning ordinance as submitted (as the court found occurred here), it may suggest modifications in rejecting such ordinance. Similarly, the same procedure equally applied to a proposed amendment before a local government may obtain certification of an amendment to a land use plan. (See § 30514, subd. (b).) The court concluded that pending City adoption and transmittal to the Coastal Commission of the commission's suggested modifications to the 2008 ordinance, the coastal zoning ordinance "cannot be 'deemed approved.' " Without approval of the commission's suggested modifications to that ordinance, the court decided, the ordinance

---

[6] Charter, article XXVII, section 27.4, subdivision (d) provides that "[t]he popular vote required by this article shall be in addition to all other applicable review and approval requirements for such major change, including environmental review in compliance with the California Environmental Quality Act (CEQA)."

itself was inconsistent with several chapter 3 policies and with CEQA (California Environmental Quality Act; Pub. Resources Code, § 21000 et seq.).

The trial court determined that the 2005 and 2008 zoning ordinances could not have been in effect before December 16, 2008, when Charter article XXVII took effect, because (1) the ordinances were never certified by the Coastal Commission before December 16, 2008, (2) the ordinances were ultimately rejected by the commission, and (3) the City did not accept and formally approve of the modifications suggested by the commission until April 20, 2010. Accordingly, the court determined that the City must submit the coastal zoning ordinance amendment to public vote and that the City must place the entire Area 2 local coastal program amendment (including the Coastal Commission's suggested modifications) on the ballot.

The trial court rebuffed as "spurious" the City's further argument that section 30514 could not apply to the local coastal program amendments because no coastal zoning ordinance had ever been certified for Area 2 in the first instance. The City had consistently treated the 2008 ordinance as an amendment to the zoning ordinance for the coastal zone. Moreover, the court found that by September 2003 the City had an effectively certified local coastal program for the entire coastal zone and an effectively certified zoning ordinance for the coastal zone that contained development standards for Area 1, along with definitions and procedural provisions applicable to both Area 1 and Area 2. "There is no doubting," the court stated, "that [the 2005 and 2008 ordinances] purported to amend the [C]ity's certified [local coastal program], including its certified zoning ordinance, and thus their effective dates are determined by reference to § 30514(a)." Neither ordinance, the court found, was certified by the Coastal Commission prior to the December 16, 2008 effective date of Charter, article XXVII.

The trial court ruled the City must submit the amendment to the City's local coastal program for Area 2 to popular vote, "as mandated by City law." The trial court therefore granted the petition for writ of mandate and declaratory relief in its entirety and ordered BBR to prepare and submit a judgment and writ.

After unsuccessfully seeking clarification of the court's writ decision, the City interposed objections to the proposed writ of mandate and judgment submitted by BBR. The court signed the judgment as proposed on August 5, 2010, and it issued a writ of mandate on August 18, 2010. On August 6, 2010, appellants filed an appeal from the judgment.

On August 5 and August 10, 2010, appellants voluntarily complied with the writ of mandate issued by the trial court and adopted all resolutions

necessary to place Measure G on the November 2, 2010 ballot.[7] The voters approved the ballot measure by a majority of 52.50 percent. After obtaining the voters' approval, the City submitted the modifications to the Coastal Commission's executive director, who determined the City's action was legally adequate and so reported to the Coastal Commission. The commission concurred with the executive director's determination, and the certification of the Area 2 local coastal program became effective on January 14, 2011.[8]

On September 24, 2010, BBR filed a motion requesting an award of costs and attorney fees of $354,978.12 pursuant to Code of Civil Procedure section 1021.5, which included a multiplier of 0.25 applied to the lodestar amount. The City opposed the motion. Although the City did not dispute that BBR was entitled to an award of fees, the City asserted counsel's rates were unreasonably high and the number of hours claimed was not reasonable. The City also claimed that there was no valid justification for applying a multiplier of 0.25 to the lodestar amount of fees and that out-of-pocket costs should not have been included in the claim for attorney fees. The City further argued that BBR was not entitled to attorney fees for administrative proceedings occurring prior to the lawsuit, and, in any case, the total fees should not exceed $128,729.33.

The trial court issued an order on October 25, 2010, awarding BBR attorney fees under Code of Civil Procedure section 1021.5. The court reduced the amount of precourt litigation fees, rejected the claim of costs, applied the full number of hours claimed for the court litigation along with a 0.25 multiplier and awarded attorney fees in the sum of $313,000.

Appellants timely appealed from the court's order awarding attorney fees. We granted a motion to consolidate the appeal on the merits with the appeal of the attorney fee award.

## CONTENTIONS

In its appeal, the City contends that (1) its 2005 zoning and coastal land use plan amendments were not subject to voter approval requirements under the plain language of Charter, article XXVII; (2) BBR's claims that the 2005

---

[7] Measure G asked the voters: "Shall the Coastal Land Use Plan and the Zoning Ordinance for the Coastal Zone for [Area 2] be amended to provide for major changes in existing policies and development standards including[:] affirming Coastal Commission recommendations, limiting the total development, height limitations, floor-area-ratio[] limitations, permitting parks on the AES site and gaining additional local authority to issue coastal development permits?"

[8] We have granted the parties' requests for judicial notice of postjudgment events, which are undisputed, in a separate order.

and 2008 coastal zoning ordinances were legally ineffective are barred by the 90-day statute of limitations governing challenges to the validity of zoning decisions; (3) the City was not precluded by the Coastal Act from adopting legally effective zoning ordinances in Area 2 prior to certification of a complete local coastal program; (4) the trial court erred in finding that "minor" amendments to the zoning and land use plan adopted by the city council at the request of the Coastal Commission constituted "major changes in allowable land use" subject to voter approval; and (5) the trial court abused its discretion in awarding attorney fees. As we hold below, all of appellants' contentions except for the last are moot in light of appellants' voluntary compliance with the writ of mandate.

## DISCUSSION

### 1. *Mootness*

After filing a notice of appeal from the judgment on August 5, 2010, on August 6 and 10, 2010, the city council took action to comply with the writ of mandate issued by the trial court by placing Measure G on the November 2, 2010 ballot.

On September 21, 2010, while the election was pending, BBR moved this court for an order dismissing the appeal as moot and for sanctions against appellant for filing a frivolous appeal. BBR argued that the appeal should be dismissed because by complying with the judgment, appellants had waived the right to appeal. BBR asserted that the city council's postjudgment actions and their implementation by the city clerk had "taken the life out" of the parties' controversies. Specifically, BBR stated that because the election day was only six weeks away, a decision on the merits of the appeal could have no practical effect in providing the City any effectual relief because no decision could be rendered by this court before election day.

Appellants opposed the motion to dismiss the appeal, arguing among other things that (1) a motion for attorney fees was then pending in the trial court, and entitlement to such fees was dependent upon the correctness of the judgment;[9] (2) the outcome of the upcoming election would directly affect the merits of the appeal as to the declaratory relief portion of the judgment; (3) the writ of mandate purported to reserve to the trial court "apparently unlimited authority" to monitor and enforce City compliance during the election process; and (4) the issues on appeal concern issues of "major

---

[9] Appellants stated, "If BBR seriously wishes to pursue this motion for dismissal, it must withdraw its pending motion for attorney fees, and waive any further claim for recovery of fees incurred during (or prior to) the trial court litigation."

interest" to numerous other cities and counties located in the California coastal zone that as yet do not have a certified local coastal program for their entire coastal zone, issues which this court has the discretion to hear and decide.

Both sides sought sanctions, either for filing and maintaining a "patently frivolous" appeal or for filing a frivolous motion.

On November 2, 2010, the voters of Redondo Beach overwhelmingly passed Measure G.[10] Shortly afterwards, on November 12, 2010, this court denied the motion to dismiss the appeal and both of the motions for sanctions. The parties then proceeded to brief the appeal on the merits.

■ Having conducted a detailed review of the record and the briefs on the merits, we now conclude that the City's voluntary compliance with the trial court's judgment and writ of mandate during the pendency of this appeal renders the appeal of the judgment moot. As the prior motion to dismiss was summarily denied in an unsigned order, the prior ruling denying BBR's motion to dismiss the appeal is not binding upon us. (*Kowis v. Howard* (1992) 3 Cal.4th 888, 900–901 [12 Cal.Rptr.2d 728, 838 P.2d 250].) We may thus reexamine the issue of mootness to determine whether all or part of the pending appeals may be dismissed. (See *Department of Industrial Relations v. Nielsen Construction Co.* (1996) 51 Cal.App.4th 1016, 1023, fn. 6 [59 Cal.Rptr.2d 785] [summary denial of motion to dismiss appeal not law of the case].) ■ Although the parties have not directly raised the question of mootness again in their briefs on the merits,[11] the court may examine a suggestion of mootness on its own motion. (*City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 479–480 [81 Cal.Rptr.3d 72]; see also *Bullis Charter School v. Los Altos School Dist.* (2011) 200 Cal.App.4th 1022, 1032 [134 Cal.Rptr.3d 133] (*Bullis*).) Upon reexamination, we conclude that through their acceptance and compliance with the judgment, and having effectively carried out the judgment, appellants have waived the right to appeal from the judgment.

When the trial court granted a judgment for BBR and issued a writ of mandate, appellants had two available options, i.e., to appeal the judgment or to comply with it. (*City of Carmel-by-the-Sea v. Board of Supervisors* (1982) 137 Cal.App.3d 964, 970 [187 Cal.Rptr. 379].) Appellants chose to voluntarily comply with the judgment, thereby waiving their right to challenge it. (*Ibid.*; see *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 746 [29

---

[10] There is no dispute that the election was properly conducted.

[11] BBR indirectly raises this point in its respondent's brief by arguing that the trial court did not err in issuing the writ but even if it did the City suffered no prejudice from the trial court's claimed error because the voters approved of the Area 2 local coastal program amendment.

Cal.Rptr.2d 804, 872 P.2d 143] (*Morehart*) [compliance by county with trial court's writ rendered dispute between parties over validity of zoning ordinances moot]; *MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 214 [130 Cal.Rptr.2d 564] (*MHC*) [city's postjudgment action in amending rent control ordinance in compliance with trial court's writ rendered appeal moot].)

■ Appellants' postjudgment acquiescence in the judgment rendered the issues raised in their appeal of the judgment moot. Appellants concede in their reply brief that "[i]t is true that the voter's approval of the minor amendments (and all other zoning and [coastal land use plan] amendments) on the November 2010 ballot and subsequent final certification of the [local coastal program] means that all measures passed by the City *are now indisputably in effect for all purposes, and will remain so regardless of the outcome of this appeal.*" (Italics added.) Therefore, even if this court should grant appellants relief from the judgment as requested, it would have no effect on the November 2, 2010 General Election, results which "are now indisputably in effect for all purposes" as appellants acknowledge.
■ However, "[a]n action that involves only abstract or academic questions of law cannot be maintained. [Citation.] And an action that originally was based on a justiciable controversy cannot be maintained on appeal if all the questions have become moot by subsequent acts or events." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 749, p. 814; see also *Streator v. Linscott* (1908) 153 Cal. 285, 288 [95 P. 42].) If the issues on appeal are rendered moot, a reversal would be without practical effect, and the appeal will be dismissed. (9 Witkin, *supra*, Appeal, § 749, p. 814; *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315–1316 [94 Cal.Rptr.2d 798], citing *Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541 [63 Cal.Rptr. 21, 432 P.2d 717] (*Eye Dog Foundation*).)

As we have explained: "It is well settled that an appellate court will decide only actual controversies and that a live appeal may be rendered moot by events occurring after the notice of appeal was filed. We will not render opinions on moot questions or abstract propositions, or declare principles of law which cannot affect the matter at issue on appeal." (*Daily Journal Corp. v. County of Los Angeles* (2009) 172 Cal.App.4th 1550, 1557 [92 Cal.Rptr.3d 219]; see also *Giles v. Horn* (2002) 100 Cal.App.4th 206, 226–227 [123 Cal.Rptr.2d 735], quoting *Finnie v. Town of Tiburon* (1988) 199 Cal.App.3d 1, 10 [244 Cal.Rptr. 581] [" 'It is well settled that an appellate court will decide only actual controversies. Consistent therewith, it has been said that an action which originally was based upon a justiciable controversy cannot be maintained on appeal if the questions raised therein have become moot by subsequent acts or events.' "]; *Wilson v. L. A. County Civil Service Com.* (1952) 112 Cal.App.2d 450, 453 [246 P.2d 688] [" 'although a case may originally present an existing controversy, if before decision it has, through

act of the parties or other cause, occurring after the commencement of the action, lost that essential character, it becomes a moot case or question which will not be considered by the court' "].)

■ The general rule regarding mootness, however, is tempered by the court's discretionary authority to decide moot issues. When an action involves a matter of continuing public interest that is likely to recur, a court may exercise an inherent discretion to resolve that issue, even if an event occurring during the pendency of the appeal normally would render the matter moot. (*Morehart, supra*, 7 Cal.4th at pp. 746–747; *MHC, supra*, 106 Cal.App.4th at p. 214; *Eye Dog Foundation, supra*, 67 Cal.2d at p. 542; *Bullis, supra*, 200 Cal.App.4th at pp. 1033–1034.) Another exception exists when, despite the happening of a subsequent event, material questions remain for the court's determination. (*Eye Dog Foundation, supra*, at p. 541; *Bullis, supra*, at p. 1034.) This exception has been applied to declaratory relief actions on the basis that the court must do complete justice once jurisdiction has been assumed. (*Eye Dog Foundation, supra*, at pp. 541–542.)

In the present case, appellants' compliance with the trial court's judgment has already taken place and the election ordered by the court has now been held. On August 5, 2010, the day before the filing of the notice of appeal, the city council adopted resolutions placing the Area 2 local coastal program amendment on the November 2, 2010 ballot; on August 10, 2010, the council adopted further resolutions amending the August 5 resolutions in compliance with the trial court judgment. City Clerk Manzano implemented those resolutions as Measure G, which was overwhelmingly approved by the electorate. The reversal sought by appellants would be an exercise in futility because the election BBR sought has already taken place as ordered by the trial court. Appellants cannot maintain an appeal that their own discretionary decisions have rendered nonappealable and nonjusticiable. Appellants could have requested that the trial court stay enforcement of the writ or sought a writ of supersedeas had there been any issue of the judgment being enforced pending appeal, but they did not. (See *City of Hollister v. Monterey Ins. Co., supra*, 165 Cal.App.4th at pp. 481–482; 9 Witkin, Cal. Procedure, *supra*, Appeal, §§ 223, 281, pp. 291, 335–336.)

Moreover, the appeal of the judgment in this case presents fact-specific issues that are unlikely to recur and thus does not justify our exercise of discretion to resolve moot questions.[12] In opposing the action in the court below and on appeal, appellants have taken the position that the 2005 and 2008 ordinances were "precursor" ordinances predating December 16, 2008, the date Charter article XXVII became law, and thus the ordinances were not

---

[12] Appellants' appeal from the award of attorney fees under Code of Civil Procedure section 1021.5 is discussed, *post.*

subject to the vote of the electors. By logical necessity, no future zoning ordinances purporting to amend the City's local coastal program can ever be passed by the city council prior to the effective date of Charter, article XXVII. Appellants assert that there are 36 coastal jurisdictions with incomplete local coastal programs and the issue of the legality of precertification amendments to local zoning regulations has a reasonable probability of recurring. As BBR notes, however, the unusual facts giving rise to the present suit with its unique ties to local events likely will not be replicated again. Nor is there merit to the argument that the claim for declaratory relief still presents a justiciable issue. BBR has acknowledged that its primary aim in the litigation was a writ commanding appellants to place the entire Area 2 local coastal program amendment to a public vote and the declaratory relief claim was merely ancillary to, and explanatory of, the writ relief. Moreover, as BBR notes, appellants have never disputed that any future major changes in allowable land use in the coastal zone passed by the city council will be subject to the voter approval requirement of Charter, article XXVII.

Appellants assert that, when a petitioner has sought and been awarded attorney fees based on its success in the trial court under the private attorney general doctrine or other statute, a subsequent appeal on the merits is not subject to dismissal. Appellants claim their appeal from the judgment is not moot because the award of attorney fees is dependent upon the propriety of the trial court's ruling on the merits of the action. They maintain that a reversal of the trial court ruling on the merits necessarily would require reversal of any award of attorney fees, as BBR would no longer qualify as a prevailing or successful party for purposes of the attorney fee claim. We disagree.

Appellants rely on four cases for their proposition. (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866 [111 Cal.Rptr.3d 374] (*Center for Biological Diversity*); *Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357 [100 Cal.Rptr.3d 358] (*Kawagoe*); *Mapstead v. Anchundo* (1998) 63 Cal.App.4th 246 [73 Cal.Rptr.2d 602] (*Mapstead*); *Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745 [12 Cal.Rptr.2d 308] (*Save Our Residential Environment*).) We find the cases are not controlling here.

*Center for Biological Diversity* and *Save Our Residential Environment* both arise under the provisions of CEQA. Unlike the appeal here, they involved the rights of third parties, who exercised their own, separate right of appeal from judgments finding environmental impact reports (EIR's) for their projects inadequate and thus ordering the agency to perform further EIR review. (*Center for Biological Diversity, supra,* 185 Cal.App.4th at pp. 873, 879–881; *Save Our Residential Environment, supra,* 9 Cal.App.4th at

pp. 1748, 1750–1751.) In *Center for Biological Diversity*, the objectors had filed a petition for writ of mandate against the county; however, the real party in interest had a written indemnity agreement with the county under which the real party in interest was required to reimburse the county for any attorney fees incurred in a legal action arising from the proposed project. (*Center for Biological Diversity, supra*, at p. 881.) The Court of Appeal held that the real party in interest was aggrieved and had standing to appeal the judgment and attorney fees order and that the county's voluntary compliance with the writ of mandate did not render the appeal of the judgment moot. (*Id.* at pp. 880–881.) In *Save Our Residential Environment*, "[m]ultiple notices of appeal were filed," and all the appeals were consolidated. (*Save Our Residential Environment, supra*, at p. 1749.) The question arose whether the city had waived its right to appeal by complying with the writ. (*Id.* at p. 1750.) After first reasoning that the appeal was not moot "[b]ecause the award of attorney fees depends on the propriety of the trial court's ruling on the merits of the action," the court noted that "even if the City has waived its right to appeal the issuance of the writ by complying with its directives, the City is powerless to waive [the real party in interest's] right to appeal." (*Id.* at p. 1751.) The material facts in both cases therefore are distinguishable from our case as there are no third party rights at stake here.

*Mapstead* and *Kawagoe* are also distinguishable. Both involved local election officials with ministerial duties to verify petition signature require-ments to be complied with by petition signers, circulators and proponents—requirements intended "to safeguard the integrity of the electoral process." (*Mapstead, supra*, 63 Cal.App.4th at p. 257.) The fee awards there were reversed despite the mootness of the appeal following an election. The cases did not involve a legislative body's own reversal of its prior refusal to enforce an important right affecting the public interest, thereby confirming the successful enforcer's status as a "successful party." (See Code Civ. Proc., § 1021.5.)

Appellants' appeal from the judgment accordingly should be dismissed.

### 2. *Attorney Fees*

■ Appellants' appeal from the postjudgment award of attorney fees is separately appealable as an order after judgment.[13] (Code Civ. Proc., § 904.1,

---

[13] We disagree with appellants' contention that attorney fees cannot be awarded unless and until it is determined that a judgment was properly rendered. A private attorney general fee may be awarded when a case has been "won on a preliminary matter, the case settled or the opposing party voluntarily withdrew its claim." (*Wal-Mart Real Estate Business Trust v. City Council of San Marcos* (2005) 132 Cal.App.4th 614, 622 [33 Cal.Rptr.3d 817] [real parties in interest successfully opposed petition for writ of mandate to preclude or delay referendum]; see

subd. (a)(2); *Citizens Against Rent Control v. City of Berkeley* (1986) 181 Cal.App.3d 213, 223 [226 Cal.Rptr. 265].) BBR concedes that dismissal of the appeal from the judgment does not prejudice appellants' ability and right to challenge the amount of private attorney general fees granted by the trial court after judgment under Code of Civil Procedure section 1021.5. As BBR acknowledges, when appellants called for the November 2, 2010 General Election, BBR had yet to file its fee motion, and the trial court had yet to award any fees. Appellants therefore could not at that time object to the fee award and thus never waived any right to appeal from that award.

We review an award of attorney fees for abuse of discretion. (*Visher v. City of Malibu* (2005) 126 Cal.App.4th 364, 368 [23 Cal.Rptr.3d 816].) " '[T]he appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " (*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 785 [54 Cal.Rptr.2d 830], quoting *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478 [243 Cal.Rptr. 902, 749 P.2d 339].)

■ In California, the fee setting inquiry ordinarily begins with the "lodestar," i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 [95 Cal.Rptr.2d 198, 997 P.2d 511] (*PLCM Group*).) The computation of time spent on the case and the reasonable value of that time is fundamental to determining an appropriate attorney fee award. (*Ibid.*) The reasonable hourly rate is the rate prevailing in the community for similar work. (*Ibid.*) After arriving at the lodestar figure, the court may then adjust that figure based on a consideration of factors specific to the case to arrive at an amount representing the fair market value for the legal services provided. (*Ibid.*) This approach "anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary." (*Ibid.*) Our Supreme Court has explained that an attorney fee award, including an award under Code of Civil Procedure section 1021.5, "should be fully compensatory" and, absent "circumstances rendering the award unjust, an . . . award should ordinarily include compensation for *all* the hours *reasonably spent*, including those relating solely to the fee." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133, 1135 [104 Cal.Rptr.2d 377, 17 P.3d 735] (*Ketchum*), citing *Serrano v. Unruh* (1982) 32 Cal.3d 621, 624, 639 [186 Cal.Rptr. 754, 652 P.2d 985] (*Serrano IV*).)

---

*Vasquez v. State of California* (2008) 45 Cal.4th 243, 248–251, 260 [85 Cal.Rptr.3d 466, 195 P.3d 1049] [stipulated injunction was effectively a "consent decree" providing sufficient basis for attorney fee award]; *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 566, 568 [21 Cal.Rptr.3d 331, 101 P.3d 140] [award of attorney fees appropriate when plaintiff's lawsuit was catalyst motivating defendant to provide primary relief sought].) Here, there can be no real dispute that BBR won the case. Thus, a determination that the judgment was valid on the merits is not a prerequisite to the award of attorney fees under Code of Civil Procedure section 1021.5.

In the present case, the attorney fees of $354,978.12 that BBR claimed included a lodestar fee of $278,751.33 for professional and paralegal services to and including September 23, 2010, the day before the motion for attorney fees was filed. The lodestar figure was based on hourly billing rates of $500 to $550 (partner), $200 to $250 (associate), and $125 (paralegal).

In support of the request for attorney fees, counsel for BBR provided the court with declarations describing their professional backgrounds that included special expertise in the areas of environmental, land use and administrative law. Lead counsel explained the rates being sought by his firm were comparable to the market rates being charged in the Los Angeles area.

Attached as exhibits to lead counsel's declaration were billing surveys conducted by a national law journal reflecting that for law firms in Los Angeles handling environmental and land use cases, hourly partner rates ranged from $475 to $850 and hourly associate rates from $275 to $505. Also attached were detailed contemporaneous time records that were maintained throughout the litigation reflecting the hours billed and the tasks performed for the litigation. The exhibits recorded the dates professional services were performed from the time BBR's counsel was retained up to the date the motion for attorney fees was filed, the description of each service performed, the amount of attorney and paralegal time spent, in increments of not less than 6 minutes, the law firm's market hourly rates and the corresponding dollar amounts. Counsel indicated that the time spent on preparing statements of professional services and expenses were not recorded or charged; the amount of time spent in some instances was reduced, omitted or eliminated; and time spent dealing with media inquiries was not recorded or included. Counsel also informed the court that a significant number of hours were consumed by addressing unnecessary procedural maneuvers by opposing counsel. Also, an extraordinary amount of time was generated by the necessity of researching City and Coastal Commission decisions and staff reports to reconstruct the City's local coastal zoning history.

The lodestar figure of $278,751.33 consisted of $244,341.33 for time commitments devoted to the merits of the case, plus $34,410 for time spent in preparing the fee motion up to the day before the motion was filed. The lodestar amount included $27,308 incurred in attorney fees during the administrative phase. BBR sought an additional $11,500 in anticipated fees to be incurred in preparing a reply and attending the motion hearing. BBR also sought reimbursement for $3,641.46 for out-of-pocket expenses incurred during the litigation. In addition, BBR sought a fee enhancement of $61,085.33, corresponding to a multiplier of 0.25 applied only to the fees related to the merits of the action.

Appellants opposed the motion for attorney fees even while acknowledging that BBR "may be entitled to" attorney fees because the trial court had ruled in its favor. Appellants asserted, however, that the number of hours was excessive or inflated and that counsel's billing records were replete with block billing and duplicative entries, all of which required an across-the-board reduction of the claimed hours by "at least 20%." Appellants also complained that the hourly rate for the lead attorney was not reasonable given his "experience, client base, practice area and type of firm." Appellants argued that a reasonable hourly rate should not exceed $350. Appellants further asserted that neither the time spent in the "administrative phase" nor out-of-pocket expenses should be included in any award for attorney fees. Appellants urged the trial court to limit the award of attorney fees to $128,729.33 in light of all these considerations.

The trial court found that the claimed hourly fees were not unreasonably high, in view of the quality of work and counsel's special expertise. The court indicated that BBR's lead counsel was a leading expert in the field of environmental, land use and administrative law and that the quality of counsel's work and skill level justified the hourly rates charged, albeit they were at the "high end" of the scale. Characterizing the action as a "close case," the court noted that it had reflected and analyzed both sides for a comparatively long time. The court did not question the veracity of the billing entries but observed there were some instances in which both counsel performed and charged for the same tasks, such as conferring with each other.[14]

Spending roughly the equivalent of two full working weeks preparing the petition and a similar amount of time preparing the motion for the writ of mandate, the court stated, "might appear excessive." However, the court noted that judging by the court's own time spent in analysis, "it comes as no surprise that detailed and careful preparation and presentation were called for." Accordingly, the court declined to reduce the number of hours allowed in calculating the fee award. With regard to prelitigation administrative hearing fees, the court noted, the same level of fees as in a court proceeding was not warranted because there is not the same intensity and attention to legal detail and analysis that is called for in a court proceeding or more formal administrative proceedings. Even though exhaustion of administrative remedies is a necessary prerequisite to pursuing litigation, the court reasoned that there is no guarantee that litigation will necessarily ensue, and fees prior to the initiation of legal proceedings are incurred without any assurance of any opportunity to recover them. Accordingly, the court exercised its discretion and reduced the fee by the amount of the precourt litigation fees; it also

---

[14] Our own examination discloses such instances were not excessive and some conferences between counsel might be expected, particularly in a case of some complexity.

rejected the claim for out-of-pocket costs. Allowing fees for the full number of hours claimed for the court litigation phase and applying the 0.25 multiplier, the court arrived at the sum of $313,000 as reasonable attorney fees.

We find no abuse of discretion in the trial court's assessment of appropriate attorney fees. In awarding attorney fees, the court has broad discretion to determine the reasonableness of the fees claimed in light of a number of factors, including the nature of the litigation, its difficulty, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances. (*PLCM Group, supra*, 22 Cal.4th at p. 1096.) "The 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.' " (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*); see also *PLCM Group, supra*, at p. 1095.) Here, the attorney fees awarded are substantial, but the record shows the trial court also discounted the fees and claimed costs by over $40,000 after analyzing the relevant factors.

█ An award of attorney fees under fee-shifting statutes is computed based on the reasonable market value of services even if the attorney has performed services pro bono or, as in this case, for a reduced fee and regardless of whether the plaintiff is represented by private or nonprofit counsel. (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 585 [110 Cal.Rptr.2d 809, 28 P.3d 860].) Our Supreme Court has consistently approved of the compensation of public interest attorneys at rates equal to those charged by private practitioners in the same community. (*Serrano IV, supra*, 32 Cal.3d at p. 642.) In *Serrano IV*, the court rejected the argument that compensating public interest attorneys at market rates represented a windfall to public interest attorneys saying that " 'compensation at a lesser rate would result in a windfall to the *defendants*.' " (*Ibid.*, italics added.) Appellants object that the hourly rate for firms and attorneys representing public entities, "like rates for those representing public interest organizations," is not commensurate with rates charged by large law firms representing private corporate entities. Appellants' reliance on the rate they paid their own attorneys, however, is akin to the cost-based approach rejected by the Supreme Court in *Serrano IV*. (*Serrano IV, supra*, at pp. 641–644.) Although the fact of public or foundational support might be relevant in determining the ultimate size of the award (see *Serrano III, supra*, 20 Cal.3d at p. 49, fn. 24), the appropriate hourly rate used to arrive at the lodestar is measured by "the prevailing billing rates of comparable private attorneys as the 'touchstone' for determination of that value" (*Serrano IV, supra*, at p. 643).

Without citation to authority, appellants also argue that there should be an inverse relationship between charging a rate at the "high end" of the scale, because one is an expert in the field, and the total number of hours billed. Appellants repeat their complaint made in the trial court that the billing records purport to show BBR's counsel logged excessive and duplicative hours on discrete tasks, such as claiming over 90 hours for drafting a single petition for writ of mandate and an additional 70-plus hours on the motion for the writ of mandate. It is not our role, however, to second-guess the trial court on such matters as whether the hours expended are justified by the product produced or whether an associate should have been assigned tasks performed by a partner. The trial court was fully cognizant of the quality of the services performed, the amount of time devoted to the case and the efforts of counsel. (See *PLCM Group, supra*, 22 Cal.4th at p. 1096.) We reiterate that " '[t]he value of legal services performed in a case is a matter in which the trial court has its own expertise.' " (*Ibid.*)

Appellants further complain that the trial court did not articulate any basis for applying an upward adjustment to the lodestar and offered no explanation for accepting BBR's 0.25 multiplier. Appellants argue that BBR claimed the novelty and difficulty of the question involved, the skill displayed in presenting them and the contingent nature of the fee award supported an upward adjustment of the lodestar. They maintain the trial court already had factored into the lodestar the novelty of the issues and counsel's skill in addressing these issues, leaving only the contingent nature of the fee award as a potential justification for an upward enhancement of the lodestar. The trial court was not required to issue a statement of decision with regard to the fee award. (*Ketchum, supra*, 24 Cal.4th at p. 1140.) As appellants did not request a statement of decision, all intendments and presumptions must be indulged in to support the judgment on matters as to which the record is silent. (*Id.* at p. 1141.) Thus, we will presume there was no double-counting of the novelty of issues and counsel's skill in addressing them. In any case, as BBR notes, the modest multiplier the trial court employed was justified by the contingent nature of counsel's compensation. (See *id.* at p. 1138 [fee enhancement for risk that attorney will not receive payment if the suit does not succeed "constitutes earned compensation," i.e., compensation that is "intended to approximate market-level compensation . . . , which typically includes a premium for the risk of nonpayment or delay in payment of attorney fees"].) Although appellants claim that only a portion of the fee was contingent, by our calculation the major portion, about 75 percent of the claimed fees, was contingent in nature.

Nor is it significant in the context of this action that the appellants here are public entities. As we have recently noted: "Allowing properly documented attorneys' fees to be cut simply because a losing party is a governmental entity would defeat the purpose of the private attorney general

doctrine codified in Code of Civil Procedure section 1021.5 and would also incentivize governmental entities to negligently or deliberately run up a claimant's attorneys' fees, without any concern for consequences." (*Rogel v. Lynwood Redevelopment Agency* (2011) 194 Cal.App.4th 1319, 1332 [125 Cal.Rptr.3d 267].)

We conclude the record does not show the trial court was " ' "clearly wrong" ' " in setting attorney fees. (*Ketchum, supra*, 24 Cal.4th at p. 1132.)

## DISPOSITION

The appeal from the judgment is dismissed, and the order granting attorney fees is affirmed. BBR is to recover costs on appeal.

Bigelow, P. J., and Grimes, J., concurred.